NATIONAL SURETY CORPORATION; YORK MILLS, INC., AND ALL OTHER
CREDITORS WHO DESIRE TO MAKE THEMSELVES PARTIES TO THIS ACTION, v.
VAN B. SHARPE AND LOUISE R. SHARPE, CO-PARTNERS, TRADING AND
DOING BUSINESS AS CARTHAGE WEAVING COMPANY.

(Filed 22 August, 1952.)

**1. Appeal and Error § 1—**

As a general rule, an appellate court will not grant relief to a party
who has not appealed or complained of the judgment.

**2. Courts § 12—**

Constitutionally enacted Federal statutes take precedence over State
laws. U. S. Constitution, Art. VI, sec. 2.

**3. Receivers § 12c—**

Receivership of an insolvent is an act of bankruptcy which puts into
operation 31 U.S.C.A. 191, which stipulates that debts due the United
States shall have priority, but does not create a lien upon the debtor's
property in favor of the United States, and therefore does not give the
United States priority over a *bona fide* conveyance made by the debtor
before receivership or over a prior specific lien embracing specific property
of the debtor as contradistinguished from a general lien covering all his
property.

**4. Same—**

26 U.S.C.A. 3670 and 3671 give the United States a lien for taxes as of
the date notice of lien is filed in the office of the register of deeds of the
county in which the property is situate, but such lien is subordinate to the
lien of a duly registered chattel mortgage, G.S. 47-20, or real estate mort-
gage, or judgment lien, G.S. 1-234, including the special lien of a contractor
perfected by judgment, G.S. 44-1, when such liens are duly acquired before
the filing of the notice of the Federal tax lien, though superior to such
liens acquired after the filing of the notice.

**5. Receivers § 7—**

G.S. 55-147 to G.S. 55-160, inclusive, are applicable as near as may be to
a receivership under G.S. 1-502.

**6. Receivers § 9—**

A receiver takes the property of the insolvent debtor subject to the
mortgages, judgments and other liens existing at the time of his appoint-
ment, and upon the sale of encumbered property by the receiver free of
such liens, the liens are transferred to the proceeds of sale. G.S. 55-149,
G.S. 55-154.

**7. Receivers § 12c—**

Indebtedness incurred by a receiver in operating the business of a private
concern owing no duty to the public cannot be given priority over the
claims of non-consenting lienholders. The distinction between such oper-
ating expenses and costs of administration is pointed out.

**8. Same—**

Costs of administration may be charged against the interests of prior lienholders, since such expenses are incurred in the preservation and liquidation of the assets of the insolvent for their benefit, and such costs of administration include court costs in proceedings relating to the receivership, compensation to the receiver and to the receiver's attorney, G.S. 55-155, bookkeeping and clerical expense, auditing expense, premiums on fire insurance on property in receivership, compensation for watchman, and costs of sale of property in receivership.

**9. Same—**

Indebtedness incurred by a receiver in operating the business of a private concern owing no duty to the public is entitled to preference over the claims of general creditors arising before the receivership, and constitute a charge first upon income, and when that is insufficient, against the property of the insolvent.

**10. Same—**

When the receiver has funds remaining after satisfying liens antedating the receivership he should apply such funds upon claims in the following order of preference: (1) costs of administration; (2) claims of the U. S. for Federal employment and social security taxes accruing during the operation of the business by the receiver; (3) claims of the city and county for property taxes assessed during the receivership, G.S. 55-160; 105-340; 105-376; 105-412; (4) claim of the State for contributions under the State Employment Law, G.S. 96-10 (c), arising during receivership; (5) claims for labor, materials and services incurred in the operation of the business by the receiver; (6) general unsecured claims.

**11. Receivers § 12d—**

The United States filed claim against the receiver for damages for breach of contract by receiver in failing to deliver goods in accordance with contract executed with the receiver in the operation of the business. The claim was challenged, but the other claimants failed to demand jury trial on their exceptions. G.S. 55-153. *Held:* It was incumbent on the United States to establish its claim before the judge in conformity with the practice where jury trial is waived, and when it presents no evidence thereon it fails to establish the claim in fact, and the order of the judge allowing same without evidence and finding by the court thereon is ineffective.

**12. Receivers § 12c—**

Preferences are not favored and can only arise by reason of some definite statutory provision or some fixed principle of common law.

**13. Same—**

An item of operating expense, even though it is incurred by the receiver in conformity with an order of the court for the operation of the business by the receiver, is not entitled to priority over non-consenting lienholders who were given no notice.

**14. Same—**

G.S. 55-136 gives priority to laborers for wages due for work performed during the period of the two months prior to the date proceedings in in-

solvency were instituted, and does not apply to wages during the period the business is operated by the receiver.

**15. Same—**

The contract price for repairing machinery of the concern on a single occasion is not a claim for "wages" within the purview of G.S. 55-136, and cannot be entitled to preference under that statute regardless of whether the contract was executed prior to, or subsequent to the operation of the business by the receiver.

**16. Same—**

A judgment rendered in favor of a claimant after the appointment of a receiver for the debtor cannot create a lien against the debtor's property because such property is vested in the receiver at the time of the rendition of the judgment.

**17. Same—**

Indebtedness incurred by a receiver in operating the business of a private concern owing no duty to the public has priority over the claim of a lienholder when such lienholder expressly or impliedly consents to such operations by the receiver.

**18. Same—**

The courts will not direct a receiver as to the distribution of a fund before the receiver has such fund in hand.

APPEALS by the plaintiff, York Mills, Inc., and eleven intervening judgment creditors, namely, American Woolen Company, Artistic Weaving Company, Cutter's Exchange, House-Hasson Hardware Company, Master Manufacturing Company, Patent Button Company, Smith-Courtney Company, D. W. Vaughn, W. Ames & Company, John Wood, and F. F. Weishaar, from *Moore, J.,* at November Term, 1951, of MOORE.

Receivership proceeding heard by the presiding judge on exceptions to the report of the receiver passing upon the validity and priority of claims against an insolvent private manufacturing concern, and recommending the order of distribution of the available assets among the creditors of the concern.

This cause has been before us on four other occasions. *Surety Corp. v. Sharpe,* 233 N.C. 644, 65 S.E. 2d 137; 233 N.C. 642, 65 S.E. 2d 138; 233 N.C. 83, 62 S.E. 2d 501; 232 N.C. 98, 59 S.E. 2d 593.

The controlling facts appear in the numbered paragraphs set forth below. The monetary items mentioned in these paragraphs and the ensuing opinion are approximate.

1. Before the day named in the next paragraph, the defendants Van B. Sharpe and Louise R. Sharpe, as partners, conducted a private manufacturing business at Carthage in Moore County, North Carolina, under the firm name of Carthage Weaving Company. Such firm name is hereafter used to signify the partnership.

2. On 20 July, 1949, an order was entered in this cause appointing a receiver to take charge of the affairs and property of the Carthage Weaving Company. The order was made with the consent of the defendants upon the verified application of the original plaintiff, National Surety Corporation, alleging the insolvency of the partnership and "all the members composing the same."

3. At all the times herein mentioned, the defendants, either as partners or as individuals, owned the property enumerated in this paragraph. The Carthage Weaving Company had two pieces of realty lying in Moore County. One was a factory in Carthage, and the other was a farm at Pinebluff. The partnership also held personal property situated in Moore County. The defendants, as individuals, possessed an apartment house and a dwelling, both of which were situated in Moore County. The apartment house was in Carthage, and the dwelling was in Pinehurst. The dwelling was covered by a deed of trust, which was made and registered on 27 April, 1946, and which vested a paramount title to the dwelling in W. A. Leland McKeithen, as substitute trustee, to secure the payment of a debt owed by the defendants as individuals to the Pilot Life Insurance Company.

4. At the time of the appointment of the receiver, the Carthage Weaving Company was indebted to numerous creditors in various sums on sundry obligations, which arose before the receivership and were as follows: (a) $2,000.00 due W. R. Makepeace; (b) $2,350.00 due O. B. Taylor; (c) $30,148.00 due the United States for income taxes; (d) $30,132.20 due thirty-one judgment creditors on thirty-one judgments; and (e) $87,646.54 due forty-eight general creditors on forty-eight unsecured accounts. All of these debts were still unpaid when this cause was heard by Judge Moore at the November Term, 1951, of the Superior Court of Moore County. None of them represented salaries or wages due employees for work done for the Carthage Weaving Company.

5. The debts of the Carthage Weaving Company to W. R. Makepeace and O. B. Taylor were for the purchase prices of specific pieces of machinery, and were secured by duly registered purchase money chattel mortgages covering such machinery.

6. The thirty-one judgments mentioned in paragraph 4 were rendered and docketed at various times between 24 January, 1947, and 8 October, 1948, and each of them constituted a lien as of the day of its docketing on all the real property owned by the defendants, either as partners or as individuals, in Moore County. The judgment creditors referred to in paragraph 4 included the appellants American Woolen Company, Artistic Weaving Company, Cutter's Exchange, House-Hasson Hardware Company, Master Manufacturing Company, Patent Button Company, Smith-Courtney Company, D. W. Vaughn, W. Ames & Company, John Wood,

and F. F. Weishaar, whose judgments accounted for $16,020.84 of all the judgment debts of the Carthage Weaving Company. For convenience of expression, these eleven appellants are hereafter called the appealing judgment creditors.

7. The general creditors mentioned in paragraph 4 embraced the plaintiff York Mills, Inc., which held an unsecured account totaling $8,166.56 against the Carthage Weaving Company for materials delivered by it to the partnership just before the appointment of the receiver. During the receivership, to wit, on 18 May, 1950, York Mills, Inc., obtained judgment on this account against Van B. Sharpe and Louise R. Sharpe in an independent action. This judgment was forthwith docketed in the office of the clerk of the Superior Court of Moore County. The record does not indicate that York Mills, Inc., was authorized by any order of court to prosecute the independent action, or that the receiver had any knowledge of its pendency.

8. At the time of the appointment of the receiver, the defendants, as individuals, were indebted to six judgment creditors, to wit, Bonitz Insulating Company, Carthage Hardware Company, J. L. Currie Company, J. W. McLeod, Pinehurst Warehouse, Inc., and Sanford Sash & Blind Company, in sums aggregating $2,588.49 upon six separate judgments, which were rendered and docketed on various dates between 6 March, 1946, and 6 November, 1947, and constituted contractors' liens upon the apartment house at Carthage. For convenience of narration, these six judgment creditors are hereafter designated as the six contractors.

9. The receiver continued and carried on the business of the Carthage Weaving Company as a private manufacturing concern from 20 July, 1949, until 30 September, 1950. This continued operation of the business was sanctioned by the original order of 20 July, 1949, and subsequent orders entered in this cause on 14 January, 1950, and 29 July, 1950. The last of these three orders was made "upon motion of York Mills, Inc.," which had theretofore intervened in the cause as a plaintiff and acquiesced in the continued operation of the business by the receiver. It appears by implication that a substantial part of the unpaid operating expenses hereinafter referred to were incurred by the receiver after the entry of the order of 29 July, 1950. It expressly appears, however, that "the judgment creditors existing prior to receivership . . . had no notice of the receivership proceedings" until the September Term, 1950, of the Superior Court of Moore County, when the "American Woolen Company, J. L. Currie Company, and numerous other creditors . . .," both secured and unsecured," appeared before the presiding judge and moved for an order in the cause "directing the receiver to cease all further operations of the business" and to distribute all available assets among the creditors according to their respective rights.

10. Certain expenses incurred by the receiver between 20 July, 1949, and 30 September, 1950, for the operation of the business of the Carthage Weaving Company remained unpaid when this cause was heard before Judge Moore at the November Term, 1951, of the Superior Court of Moore County. These unpaid operating expenses were as follows: (a) $6,855.22 due various regular employees for salaries and wages for work done for the receiver; and (b) $15,759.50 due twenty-four independent business concerns for materials or services furnished the receiver. These independent business concerns included the claimant, Gouger Electric Company, which rendered services worth $782.94 to the receiver in repairing undesignated machinery in the factory at Carthage, and the claimant, Esso Standard Oil Company, which delivered materials worth $1,173.46 to the receiver. The transaction between the Esso Standard Oil Company and the receiver was expressly authorized in advance by an order in this cause.

11. Certain taxes accrued against the Carthage Weaving Company during the receivership and were unpaid when this cause was heard by Judge Moore at the November Term, 1951, of the Superior Court of Moore County. These taxes were as follows: (a) $3,089.46 due Moore County for county taxes on the real and personal property of the partnership; (b) $4,309.11 due the Town of Carthage for municipal taxes on the factory and personal property of the partnership; (c) $5.86 due the Town of Pinebluff on the farm of the partnership; (d) $4,633.31 due the United States for Federal employment and social security taxes; and (e) $1,509.89 due North Carolina for contributions under the State Employment Security Law.

12. When the motion of the American Woolen Company and other creditors was heard at the September Term, 1950, of the Superior Court of Moore County, the court found that the operation of the business of the Carthage Weaving Company by the receiver was resulting in a continuing loss. For this reason, the court directed the receiver to cease operating the business at midnight on 30 September, 1950; to give notice to the creditors of the Carthage Weaving Company to present their claims to him by 23 October, 1950, on pain of being barred from participation in the distribution of the assets available for application to the debts of the insolvent partnership; to cause the homestead and personal property exemptions allowed the defendants by law to be allotted to them out of their property; to sell free from all liens all the remaining real and personal property owned by the defendants, either as partners or as individuals, except the equity of redemption in the dwelling at Pinehurst; and to report to the court his decision as to how the proceeds of the sale should be distributed among the creditors. The equity of redemption in the dwelling at Pinehurst was exempted from sale by the receiver because

the paramount deed of trust embracing the dwelling was in process of being foreclosed by W. A. Leland McKeithen, the substitute trustee, who was directed by an order in this cause to pay over to the receiver on the completion of foreclosure any surplus left in his hands after payment of the debt due the Pilot Life Insurance Company and the costs and fees incident to foreclosure. The foreclosure of the deed of trust on the dwelling at Pinehurst had not been consummated when this cause was heard by Judge Moore at the November Term, 1951, of the Superior Court of Moore County.

13. The receiver obeyed all the directions given him by the court as set forth in the preceding paragraph. In so doing, he employed a watchman at wages totaling $1,404.26 to guard the property in his charge until he could effect its satisfactory sale, and the obligation thus incurred remained unpaid when this cause was heard by Judge Moore at the November Term, 1951, of the Superior Court of Moore County.

14. Claims were filed with the receiver for all the debts and taxes referred to in paragraphs 4, 8, 10, and 11. The claimants disagreed respecting the relative priorities of some of these claims, but they did not dispute the validity of any of them. In fact, the only claim presented to the receiver whose validity was challenged was a claim not hitherto mentioned filed by the United States for damages for supposed breaches of contracts allegedly made by the receiver with governmental agencies. The record indicates that this controverted claim was based on the following theory: That the receiver made several binding contracts to manufacture goods for governmental agencies; that the receiver closed the factory in obedience to the order of court before all the goods were delivered; that the act of the receiver in closing the factory under these circumstances breached the contracts with the governmental agencies, and caused the United States to suffer damages; and that such damages constituted a valid claim of high priority against the assets available for the payment of the obligations of the Carthage Weaving Company.

15. After causing homestead and personal property exemptions to be assigned to the defendants out of their property and selling the remaining property owned by them, either as partners or as individuals, other than the equity of redemption in the dwelling at Pinehurst, the receiver had $85,155.68 in his hands for application to the costs and expenses of the receivership and for distribution among the claimants. This sum was the total of these items: (a) $17,355.68, the unexpended portion of the sale price of the personal property of the partnership; (b) $55,000.00, the sale price of the factory at Carthage; (c) $5,300.00, the sale price of the farm at Pinebluff; and (d) $7,500.00, the sale price of the apartment house at Carthage. The unexpended portion of the sale price of the personal property included $12,000.00 derived from the sale of the machinery

mortgaged to W. R. Makepeace, and $795.00 derived from the sale of the machinery mortgaged to O. B. Taylor. Under the orders of the court, all property was sold free of liens, and liens were transferred from the property to the proceeds of its sale.

16. The receiver passed on the validity and priority of all claims, and made report thereon to the court. The United States and certain other claimants noted various exceptions to the report of the receiver. The portions of the report necessary to an understanding of the questions arising on the appeal are hereinafter referred to in paragraph 19 of this statement of facts.

17. This cause was heard on the report of the receiver and the exceptions to it at the November Term, 1951, of the Superior Court of Moore County. At that time, Judge Moore, who presided, made allowances for the costs of administration of the receivership. These allowances totaled $8,784.78, and covered auditor's fees, clerical hire, compensation for the receiver, counsel fees, court costs, and insurance protecting the property during the receivership.

18. Judge Moore then ruled on the exceptions to the report of the receiver, and embodied his rulings in an order of distribution directing the receiver to apply the money in his hands to the costs, debts, and taxes under consideration in the following order:

First class. The operating expenses set forth in paragraph 10; the Federal employment and social security taxes set out in paragraph 11; the contributions under the State Employment Security Law mentioned in paragraph 11; the wages of the watchman referred to in paragraph 13; and the costs of administration set forth in paragraph 17.

Second class. The Federal income taxes set out in paragraph 4.

Third class. The debt of W. R. Makepeace mentioned in paragraph 4; the sum of $795.00 representing a part of the debt of O. B. Taylor referred to in paragraph 4; the six contractors' liens set forth in paragraph 8; and the property taxes of Moore County, the Town of Carthage, and the Town of Pinebluff set out in paragraph 11.

Fourth class. The claim of the United States for damages totaling $176,790.55 for supposed breaches of contracts allegedly made by the receiver with governmental agencies as stated in paragraph 14.

Fifth class. The sum of $1,555.00 representing a part of the debt of O. B. Taylor, the thirty-one judgments, and the forty-eight unsecured accounts referred to in paragraph 4.

The order of distribution provided for preferences within the third class by directing that the claims of Makepeace and Taylor "be paid from the amounts derived from the sale of the personal property on which the mortgages were given" and that the six contractors' liens "against the apartment house . . . be paid out of the proceeds of the sale of such

apartment house." It refrained from passing on the relative priorities as among themselves of the claims in the fifth class on the ground that the claims of the other classes would "more than exhaust the amount in the hands of the receiver."

19. The order of distribution rejected several rulings of the receiver, including a ruling that the thirty-one judgment creditors mentioned in paragraph 4 had liens on the proceeds of the sales of the realty and by reason thereof occupied a preferred status, which entitled them to have their judgments paid ahead of a substantial portion of all the other claims. In addition, the order of distribution drastically changed the ruling of the receiver relating to the claim of the United States for damages for supposed breaches of contracts allegedly made by the receiver with governmental agencies. When this claim was originally filed with the receiver, it totaled $88,550.72. The receiver approved the claim for that amount, but adjudged it to be unpreferred in nature. The United States and certain other claimants excepted to this ruling of the receiver on divergent grounds. The United States asserted that the receiver erred in refusing to accord its claim high priority while the other claimants challenged the validity of the claim in its entirety. The other claimants did not demand a jury trial on their exceptions. When the report of the receiver was heard in the Superior Court, the presiding judge permitted the United States to amend its claim for damages by increasing its amount to $176,790.55, and thereupon adjudged in his order of distribution that the United States had a valid preferred claim on this score for that sum. The judge made this adjudication without hearing any evidence relating to the claim and without making any findings of fact to support this conclusion.

20. The York Mills and the eleven appealing judgment creditors excepted to the order of distribution and appealed, assigning errors.

*John M. Spratt and G. S. Steele for the plaintiff, York Mills, Inc., appellant.*

*W. D. Sabiston, Jr., for the claimant, American Woolen Company, appellant.*

*Johnson & Johnson and W. D. Sabiston, Jr., for the claimants, Artistic Weaving Company, Cutter's Exchange, House-Hasson Hardware Company, Master Manufacturing Company, Patent Button Company, Smith-Courtney Company, D. W. Vaughn, W. Ames & Company, John Wood, and F. F. Weishaar, appellants.*

*McKeithen & McConnell for the claimant, Esso Standard Oil Company, appellee.*

*W. Clement Barrett for the claimants, Gouger Electric Company and the employees of the receiver, appellees.*

ERVIN, J. The order of distribution consigns the claims of the York Mills and the eleven appealing judgment creditors to the lowest category. The assignments of error assert that the claims of these parties are of high dignity; that as such they are entitled to preference in the distribution of the assets in the hands of the receiver over nearly all the claims assigned to the preceding classes of priority; and that in consequence the court erred to the prejudice of the appellants in relegating their claims to positions inferior to such other claims. In addition, the assignments of error declare that there is neither a factual nor a legal basis for the claim of the United States for damages for the supposed breaches of contracts allegedly made by the receiver with governmental agencies.

It is plain, therefore, that this appeal necessitates a review of virtually all of the provisions of the order of distribution. In performing this judicial task, however, we will not give the twenty non-appealing judgment creditors mentioned in paragraph 4 of the statement of facts any greater relief than that afforded them in the court below even if we conclude that the presiding judge committed error in putting them in the lowest category of creditors. The non-appealing judgment creditors have acquiesced in the order of distribution. As a general rule, an appellate court will not grant relief to a party who has not appealed or complained of the judgment. *Van Dyke v. Insurance Co.,* 173 N.C. 700, 91 S.E. 600; 5 C.J.S., Appeal and Error, section 1835.

The first question presented by the assignments of error involves these subsidiary inquiries:

1. What were the relative rights of the creditors whose claims antedate the receivership at the time of the appointment of the receiver?

2. To what extent, if any, have those rights been changed or impaired by events occurring during the receivership?

In determining the relative rights of the pre-existing creditors against the defendants and their property at the time of the appointment of the receiver, recourse must be had to relevant Federal statutes and State laws. Since constitutionally enacted Federal statutes take precedence over State laws under the supremacy clause of the Constitution of the United States, we will first refer to the pertinent Federal statutes. Art. VI, Sec. 2, U. S. Const.

These statutes and the decisions interpreting them are set forth in the numbered paragraphs which follow.

1. The statute codified as 31 U.S.C.A. section 191, which had its genesis in the Act of Congress of 3 March, 1797, stipulates that "whenever any person indebted to the United States is insolvent, or whenever the estate of any deceased debtor, in the hands of the executors or administrators, is insufficient to pay all the debts due from the deceased, the debts due the United States shall be first satisfied; and the priority established shall

extend as well to cases in which a debtor, not having sufficient property to pay all his debts, makes a voluntary assignment thereof, or in which the estate and effects of an absconding, concealed, or absent debtor are attached by process of law, as to cases in which an act of bankruptcy is committed."

2. Whenever an insolvent is indebted to the United States and a receiver is put in charge of his property, 31 U.S.C.A. section 191 comes into play, and the debts due to the United States must be first satisfied. *Illinois ex rel. Gordon v. Campbell,* 329 U.S. 362, 67 S. Ct. 340, 91 L. Ed. 348; *Bramwell v. United States Fidelity & G. Co.,* 269 U.S. 483, 46 S. Ct. 176, 70 L. Ed. 368; *United States v. Oklahoma,* 261 U.S. 253, 43 S. Ct. 295, 67 L. Ed. 638; *Leggett v. College,* 234 N.C. 595, 68 S.E. 2d 263; *Bishop v. Black,* 233 N.C. 333, 64 S.E. 2d 167. This is true because putting a receiver in charge of an insolvent debtor's property constitutes an act of bankruptcy. 11 U.S.C.A. section 21 (a) (5); *Illinois ex rel. Gordon v. Campbell, supra; Manufacturers' Finance Co. v. McKey,* 294 U.S. 442, 55 S. Ct. 444, 79 L. Ed. 982.

3. Section 191 of Title 31 of the United States Code Annotated does not create a lien upon the insolvent debtor's property in favor of the United States, but merely confers upon the United States a right of priority in payment out of the property in the hands of the receiver. *Bramwell v. United States Fidelity & G. Co., supra; United States v. Oklahoma, supra; Beaston v. Farmers' Bank of Delaware,* 12 Pet. 102, 9 L. Ed. 1017; *United States v. Fisher,* 2 Cranch 358, 2 L. Ed. 304. The priority of the United States arises upon the appointment of the receiver. *Illinois ex rel. Gordon v. Campbell, supra; Leggett v. College, supra; Bishop v. Black, supra.* As a consequence, 31 U.S.C.A. section 191 does not give the United States priority over a *bona fide* conveyance made by the debtor before the receivership, or over a prior specific lien embracing specific property of the debtor as contradistinguished from a general lien covering all his property. *Illinois ex rel. Gordon v. Campbell, supra; Beaston v. Farmers' Bank of Delaware, supra; Brent v. Bank of Washington,* 10 Pet. 596, 9 L. Ed. 547; *Field v. United States,* 9 Pet. 182, 9 L. Ed. 94; *Conard v. Atlantic Ins. Co. of New York,* 1 Pet. 386, 7 L. Ed. 189; *Thelusson v. Smith,* 2 Wheat. 396, 4 L. Ed. 271; 75 C.J.S., Receivers, section 284.

4. Taxes due the United States constitute debts within the provision of 31 U.S.C.A. section 191 that debts due the United States shall be first satisfied in case of a debtor's insolvency. *Massachusetts v. United States,* 333 U.S. 611, 68 S. Ct. 747, 92 L. Ed. 968; *Illinois ex rel. Gordon v. United States,* 328 U.S. 8, 66 S. Ct. 841, 90 L. Ed. 1049; *United States v. Texas,* 314 U.S. 480, 62 S. Ct. 350, 86 L. Ed. 356; *Stripe v. United*

*States,* 269 U.S. 503, 46 S. Ct. 182, 70 L. Ed. 379; *Price v. United States,* 269 U.S. 492, 46 S. Ct. 180, 70 L. Ed. 373.

5. The statutes now embodied in Sections 3670 and 3671 of Title 26 of the United States Code Annotated, which constitute a revision of the Act of Congress of 13 July, 1866, give the United States a lien for taxes due it. Section 3670 provides that if any person liable to pay a tax to the United States neglects or refuses to pay such tax after demand, the amount (including any interest, penalty, additional amount, or addition to such tax, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights of property, whether real or personal, belonging to such person. Under Section 3671, the lien for Federal taxes arises at the time the assessment list is received by the collector of internal revenue unless another date is specifically fixed by law, and continues until liability for the tax is satisfied or becomes unenforceable by reason of lapse of time.

6. Under these statutes, unrecorded Federal tax liens are accorded priority over all persons except those given protection by the subsequently enacted statute mentioned in the next paragraph. *United States v. Security Trust & Sav. Bank,* 340 U.S. 47, 71 S. Ct. 111, 95 L. Ed. 53; *United States v. Snyder,* 149 U.S. 210, 13 S. Ct. 846, 37 L. Ed. 705; *United States v. Barndollar & Crosbie,* 166 F. 2d 793; *United States v. Sampsell,* 153 F. 2d 731; *MacKenzie v. United States,* 109 F. 2d 540; *United States v. Fisher,* 93 F. Supp. 73; *United States v. Caldwell,* 74 F. Supp. 114; *United States v. Record Pub. Co.,* 60 F. Supp. 194; *Filipowicz v. Rothensies,* 43 F. Supp. 619.

7. Section 3672 of Title 26 of the United States Code Annotated, which is a re-enactment and extension of an Act of Congress of 4 March, 1913, specifies that the Federal tax lien created by Sections 3670 and 3671 "shall not be valid as against any mortgagee, pledgee, purchaser, or judgment creditor until notice thereof has been filed by the collector (1) in the office in which the filing of such notice is authorized by the law of the State or Territory in which the property subject to the lien is situated, whenever the State or Territory has by law authorized the filing of such notice in an office within the State or Territory; or (2) in the office of the clerk of the United States district court for the judicial district in which the property subject to the lien is situated, whenever the State or Territory has not by law authorized the filing of such notice in an office within the State or Territory." North Carolina has provided by statute that "notices of liens for internal revenue taxes payable to the United States . . . may be filed in the office of the register of deeds of the county . . . within which the property subject to such lien is situated." G.S. 44-65.

8. Under Section 3672 of Title 26 of the United States Code Annotated, the date of the filing of the notice of a Federal tax lien controls in a

controversy respecting priority as between the United States and a judgment lien creditor, a mortgagee, a pledgee, or a purchaser. *Board of Sup'rs of La. State University v. Hart,* 210 La. 78, 26 So. 2d 361, 174 A.L.R. 1366; *Tildesley Coal Co. v. American Fuel Corporation,* 130 W. Va. 720, 45 S.E. 2d 750. As a consequence, a Federal tax lien is inferior to either a chattel mortgage or a real estate mortgage recorded prior to the filing of the notice of the tax lien. *United States v. Sampsell, supra; United States v. Beaver Run Coal Co.,* 99 F. 2d 610; *Miners' Sav. Bank of Pittston, Pa., v. Joyce,* 97 F. 2d 973; *Ormsbee v. United States,* 23 F. 2d 926; *In re Fahnestock Mfg. Co.,* 7 F. 2d 777; *Sherwood v. United States,* 5 F. 2d 991; *Bank of America Nat. Trust & Sav. Asso. v. United States,* 84 F. Supp. 387; *In re F. MacKinnon Mfg. Co.,* 24 F. 2d 156. A Federal tax lien is likewise subordinate to the lien of a judgment docketed before the filing of the notice of the tax lien. *In re Northwest Wood Products Co.,* 168 F. 2d 639; *United States v. Sampsell, supra; Claude D. Reese, Inc., v. United States,* 75 F. 2d 9; *United States v. Record Pub. Co., supra; United States v. Spreckels,* 50 F. Supp. 789; *Dannenberg v. L. Leopold & Co.,* 188 Misc. 250, 65 N.Y.S. 2d 549; *Manufacturers' Trust Co. v. Sobel,* 175 Misc. 1067, 26 N.Y.S. 2d 145; *In re Astoria Boulevard,* 171 Misc. 1018, 13 N.Y.S. 2d 433. The converse of these propositions is true. Federal tax liens take precedence over all mortgages and judgment liens acquired after the filing of the notice of the tax liens. *United States v. Security Trust & Sav. Bank, supra; MacKenzie v. United States, supra; Miller v. Bank of America, N. T. & S. A.,* 166 F. 2d 415; *Bank of America Nat. Trust & Sav. Ass'n v. United States,* 73 F. Supp. 303; *United States v. Record Pub. Co., supra; United States v. Spreckels, supra; In re Bowen,* 48 F. Supp. 67; *Industrial Com'r of N. Y. v. Stambler,* 196 Misc. 1022, 95 N.Y.S. 2d 70. Under Section 3672 of Title 26 of the United States Code Annotated, Federal taxes assessed after the docketing of a judgment lien or the recording of a mortgage are junior to the claim of the judgment creditor or the mortgagee. *Ferris v. Chic-Mint Gum Co.,* 14 Del. Ch. 232, 124 A. 577.

9. In enacting the provision of 26 U.S.C.A. section 3672 that a lien for unpaid United States taxes is not valid against a mortgagee, pledgee, purchaser, or judgment creditor until notice of the lien is filed by the collector of internal revenue, Congress impliedly amended *pro tanto* the provision of 31 U.S.C.A. section 191 giving debts due the United States priority over other debts in the distribution of the assets of an insolvent debtor among his creditors. 59 C.J., Statutes, section 434. In consequence, the United States does not have priority in the distribution of the assets of an insolvent debtor for unpaid Federal taxes over docketed judgment liens or recorded mortgages antedating the filing of notice of the lien of such taxes. *Ferris v. Chic-Mint Gum Co., supra; In re Deck-*

*er's Estate,* 355 Pa. 331, 49 A. 2d 714; *In re Meyer's Estate,* 159 Pa. Super. 296, 48 A. 2d 210.

The State laws germane to this aspect of the litigation are summarized in the numbered paragraphs set forth below.

1. When a creditor takes a chattel mortgage from his debtor as security for the payment of his debt and causes the mortgage to be registered in the county where the debtor resides or in the county where the personal property is situated in case the debtor resides out of the State, he acquires property rights in the personal property covered by his mortgage. G.S. 47-20; *Odom v. Clark,* 146 N.C. 544, 60 S.E. 513. These rights entitle the creditor to sell the mortgaged property for the satisfaction of his debt, and are tantamount to a specific lien on specific property within the purview of the decisions interpreting 31 U.S.C.A. section 191. *North River Coal & Wharf Co. v. McWilliams Bros., Inc.,* 32 F. 2d 355; *Bank of Wrangell v. Alaska Asiatic Lumber Mills,* 84 F. Supp. 1.

2. When a creditor obtains a judgment and causes it to be docketed on the judgment docket of the Superior Court in any county, the judgment becomes a general lien "on the real property in the county where the same is docketed of every person against whom . . . such judgment is rendered, and which he has at the time of the docketing thereof in the county in which such real property is situated, or which he acquires at any time thereafter, for ten years from the date of the rendition of the judgment." G.S. 1-234; McIntosh: North Carolina Practice and Procedure in Civil Cases, section 666.

3. G.S. 44-1 gives a contractor an inchoate lien upon a building and the lot on which it is situated for work done and materials furnished by him in constructing, improving, or repairing such building pursuant to a contract with the owner. *Assurance Society v. Basnight,* 234 N.C. 347, 67 S.E. 2d 390. When the contractor perfects such inchoate lien in compliance with the requirements of Article 8 of Chapter 44 of the General Statutes, the resulting judgment creates this twofold lien: (1) A special lien on the building and the lot upon which it is situated; and (2) a general lien on the other real property of the owner in the county where the judgment is docketed. Under the controlling statute, the property subject to the special lien, *i.e.,* the building and the lot on which it is situated, must be sold for the satisfaction of the judgment before resort can be had to the other property of the owner. G.S. 44-46; *Pipe & Foundry Co. v. Howland,* 111 N.C. 615, 16 S.E. 859; *McMillan v. Williams,* 109 N.C. 252, 13 S.E. 764.

4. Where several judgments have been docketed against the same debtor subsequent to his acquisition of real property, the liens of such judgments take rank or priority with reference to such property according to the dates when such judgments were respectively docketed. *Hardware Co.*

*v. Jones,* 222 N.C. 530, 23 S.E. 2d 883; McIntosh: North Carolina Practice and Procedure in Civil Cases, section 667.

The record is somewhat lacking in clarity on the present phase of the controversy. Nevertheless, it does justify the inference that the Collector of Internal Revenue for the District of North Carolina received an assessment list covering the income taxes due the United States prior to the appointment of the receiver, and that in consequence the United States acquired a lien for such taxes under the provisions of Sections 3670 and 3671 of Title 26 of the United States Code Annotated before that event occurred. There is nothing in the record, however, indicating that notice of the lien for Federal income taxes was filed in the office of the Register of Deeds of Moore County at any time before the recording of the chattel mortgages and the docketing of the judgments mentioned in paragraphs 4, 5, 6 and 8 of the statement of facts.

These things being true, we conclude that the pre-existing creditors had the following rights against the defendants and their property at the time of the appointment of the receiver:

1. W. R. Makepeace and O. B. Taylor had property rights tantamount to specific liens on the personal property covered by their respective chattel mortgages.

2. The six contractors named in paragraph 8 of the statement of facts had special liens on the apartment house at Carthage and general liens on the factory in Carthage and the farm at Pinebluff; and the judgment creditors mentioned in paragraphs 4 and 5 of the statement of facts held general liens on the apartment house, factory, and farm. The judgment liens, whether general or special, had priority as among themselves according to the order of the docketing of their underlying judgments.

3. The United States held a Federal tax lien for the unpaid income taxes on all the real and personal property of the defendants, but such tax lien was subordinate to the two chattel mortgages and the special and general liens of all the judgment creditors.

4. The general creditors mentioned in paragraphs 4 and 7 of the statement of facts had no liens of any character. They merely held unsecured claims against the defendants.

This brings us to the subsidiary inquiry whether the rights of the pre-existing creditors have been changed or impaired by the events occurring during the receivership.

It seems advisable to emphasize at this juncture that the Carthage Weaving Company is a private industrial concern having no duty to perform a service of a public nature, and that the money available for distribution represents the *corpus* of property, which was owned by the defendants, either as partners or as individuals, when the various claims

antedating the receivership accrued, and which has been sold by the receiver by permission of court free from liens.

The receiver was appointed under the provisions of the Code of Civil Procedure. Under G.S. 1-502, the statutes embodied in G.S. 55-147 to G.S. 55-160, both inclusive, are "applicable, as near as may be," to a receiver so appointed.

G.S. 55-149 provides in express terms that upon the appointment of a receiver for an insolvent debtor, all of the real and personal property of the insolvent debtor forthwith vests in the receiver. In the very nature of things, the receiver takes the property of the insolvent debtor subject to the mortgages, judgments, and other liens existing at the time of his appointment. *Vanderwal v. Dairy Co.,* 200 N.C. 314, 156 S.E. 512; *Acceptance Corporation v. Mayberry,* 195 N.C. 508, 142 S.E. 767; *Martin v. Vanlaningham,* 189 N.C. 656, 127 S.E. 695; *Thompson v. Dillingham,* 183 N.C. 566, 112 S.E. 321; *Lasley v. Scales,* 179 N.C. 578, 103 S.E. 214; *Roberts v. Manufacturing Co.,* 169 N.C. 27, 85 S.E. 45; *Withrell v. Murphy,* 154 N.C. 82, 69 S.E. 748; *Garrison v. Vermont Mills,* 154 N.C. 1, 69 S.E. 743; *Fisher v. Bank,* 132 N.C. 769, 44 S.E. 601; *Bank v. Bank,* 127 N.C. 432, 37 S.E. 461; *Pelletier v. Lumber Co.,* 123 N.C. 596, 31 S.E. 855, 68 Am. S. R. 837; *Worth v. Bank,* 122 N.C. 397, 29 S.E. 775; *Cotton Mills v. Cotton Mills,* 116 N.C. 647, 21 S.E. 431. This rule is recognized and enforced when the court permits a receiver to sell encumbered property free from liens, and transfers the liens to the proceeds of sale. G.S. 55-154; 75 C.J.S., Receivers, section 290.

Liens constitute valuable property rights. This observation is trebly true if the debtor is insolvent. A primary purpose for the receivership of an insolvent private concern owing no duty to the public is the preservation of the rights of lien creditors as they exist at the time of the appointment of the receiver. *Mlodzik v. Ackerman Oil Co.,* 191 Wis. 233, 212 N.W. 790, 54 A.L.A. 266. It would thwart this purpose and offend the first principle of economic righteousness to permit an operating receiver to hazard the property rights of lienholders without their consent in a perilous private enterprise merely because the court may entertain the uncertain hope that some pecuniary advantage might thereby be obtained for the general creditors or some other third persons. Besides, such course would transgress the basic concept enshrined in Article I, Section 17, of the State Constitution that no person can be deprived of his property except by his own consent or the law of the land. *Eason v. Spence,* 232 N.C. 579, 61 S.E. 2d 717.

For these reasons, we hold that indebtedness incurred by a receiver for the expenses of carrying on and operating the business of an insolvent private concern owing no duty to the public cannot be given priority over the claims of non-consenting lienholders to the *corpus* of the property.

This holding is sanctioned by *Roberts v. Manufacturing Co., supra,* where this Court stamped with its approval this declaration from *International Trust Co. v. United Coal Co.,* 27 Colo. 246, 60 P. 621, 83 Am. S. R. 59: "In administering the affairs of an ordinary insolvent private business corporation, for which a receiver has been appointed, a court of equity has not the power to authorize the receiver to incur indebtedness for carrying on the business and to make the same a first and paramount lien upon the *corpus* of the property superior to that of prior lienholders without their consent." Moreover, our conclusion on this point is in accord with the overwhelming weight of authority in other jurisdictions. *Nicholson v. Western Loan & Building Co.,* 60 F. 2d 516; *American Engineering Co. v. Metropolitan By-Products Co.,* 280 F. 677; *The Wabash,* 279 F. 921; *In re J. B. & J. M. Cornell Co.,* 201 F. 381; *Union Trust Co. v. Southern Sawmills & Lumber Co.,* 166 F. 193, 92 C.C.A. 101; *International Trust Co. v. Decker Bros.,* 152 F. 78, 81 C.C.A. 302, 11 L.R.A. (N.S.) 152; *Hanna v. State Trust Co.,* 70 F. 2, 16 C.C.A. 586, 30 L.R.A. 201; *Farmers' Loan & Trust Co. v. Grape Creek Coal Co.,* 50 F. 481, 16 L.R.A. 603; *Belknap Sav. Bank v. Lamar Land & Canal Co.,* 28 Colo. 326, 64 P. 212; *International Trust Co. v. United Coal Co., supra; Orr v. Dade Developers,* 138 Fla. 122, 190 So. 20; *Knickerbocker Trust Co. v. Green Bay Phosphate Co.,* 62 Fla. 519, 56 So. 699; *Stevens v. Evening Courier,* 31 Idaho 710, 175 P. 964; *Cronan v. Kootenai County First Judicial Dist. Ct.,* 15 Idaho 184, 96 P. 768; *Dalliba v. Winschell,* 11 Idaho 364, 82 P. 107, 114 Am. S. R. 267; *Mountain City Motor Co. v. Mountain City Motor Co.,* 221 Ky. 579, 299 S.W. 189; *Freeman v. Craft,* 220 Ky. 15, 294 S.W. 822; *Hooper v. Central Trust Co.,* 81 Md. 559, 32 A. 505, 29 L.R.A. 262; *Supreme Fuel Sales Co. v. Peerless Plush Mfg. Co.,* 117 N. J. Eq. 259, 175 A. 358; *Lockport Felt Co. v. United Box Board & Paper Co.,* 74 N. J. Eq. 686, 70 A. 980; *Terry v. Martin,* 7 N.M. 54, 32 P. 157; *Farmers' Loan & Trust Co. v. Bankers' & Merchants' Tel. Co.,* 148 N.Y. 315, 42 N.E. 707, 31 L.R.A. 403, 51 Am. S. R. 690; *Raht v. Attrill,* 106 N.Y. 423, 13 N.E. 282, 60 Am. R. 456, 20 Abb. N. C. 26; *Sinopoulo v. Portman,* 192 Okl. 558, 137 P. 2d 943; *James v. Lemlex,* 139 Okl. 199, 281 P. 7098; *Stacy v. McNicholas,* 76 Or. 167, 144 P. 96, 148 P. 67; *United States Investment Co. v. Portland,* 40 Or. 523, 64 P. 644, 67 P. 194, 56 L.R.A. 627; *Moore v. Lincoln Park & Steamboat Co.,* 196 Pa. 519, 46 A. 857; *Lane v. Washington Hotel Co.,* 190 Pa. 230, 42 A. 697; *Gillespie v. Blair Glass Co.,* 189 Pa. 50, 41 A. 1112; *Rhode Island Hospital Trust Co. v. S. H. Greene & Sons Corporation,* 50 R.I. 305, 146 A. 765; *Tennant v. Dunn,* 130 Tex. 285, 110 S.W. 2d 53; *Craver v. Greer,* 107 Tex. 356, 179 S.W. 862; *Moran v. Leccony Smokeless Coal Co.,* 124 W. Va. 54, 18 S.E. 2d 808; *Thomsen*

*v. Cullen,* 196 Wis. 581, 219 N.W. 439; *First Nat. Bank v. Cook,* 12 Wyo. 492, 76 P. 674, 78 P. 1083, 2 L.R.A. (N.S.) 1012.

Notwithstanding the rule that pre-existing liens on the property of an insolvent private concern owing no duty to the public cannot be displaced in favor of debts contracted by the receiver in carrying on and operating the business of the concern without the consent of the lienholders, the court may charge against the interests of lienholders expenses incurred by the receiver in preserving and selling the property subject to the liens and in applying the cash realized by its sale upon the claims of the lienholders. *Wood v. Woodbury & Pace,* 217 N.C. 356, 8 S.E. 2d 240; *Bank v. Country Club,* 208 N.C. 239, 179 S.E. 882; *Kelly v. McLamb,* 182 N.C. 158, 108 S.E. 435; *Colorado Wool Marketing Ass'n v. Monaghan,* 66 F. 2d 313; *Turner v. State Wharf & Storage Co.,* 263 Mass. 92, 160 N.E. 542; *Sinopoulo v. Portman, supra.* This practice is justified because these expenses are such as would necessarily be incurred by the lienholders themselves in enforcing their claims in the absence of the receivership. As a general rule, however, expenses of this character will not be charged against the interests of lienholders where unencumbered assets are available for their payment. *Lumber Co. v. Lumber Co.,* 150 N.C. 281, 63 S.E. 1048, and 152 N.C. 270, 67 S.E. 579.

Confusion arises in some cases on account of a failure to note the essential difference between costs of administration and expenses of operation in operating receiverships. The necessity for observing this difference is reflected in these observations of the Supreme Court of Appeals of West Virginia : "Costs and expenses of receivership are generally limited to taxes and those costs and expenses necessary to preserve the estate for the benefit of all persons interested, and are payable, primarily, out of the fund in the hands of the receiver, but if necessary, out of the *corpus* of the estate in the custody of the court. The prestige and dignity of the court is involved in seeing that expenses incurred under its direction are paid; otherwise it would be loathe to take charge of property under a receivership in any case. But this does not mean that the court can operate the property through a receiver, and through such operations encroach upon the rights of creditors, especially lienholders, by charging the expenses of such operations to the *corpus* of the estate by which such liens are secured." *Moran v. Leccony Smokeless Coal Co., supra.*

Costs of administration are preferred in payment to expenses of operation. This is so for the very simple reason that the cost of administering property in receivership and the expense of preserving and selling such property and distributing its proceeds among creditors are virtually identical. Costs of administration include such items as the following: (1) Court costs in proceedings relating to the receivership, G.S. 55-155, *Goldberg v. Minerva Sales Co.,* 286 Ill. App. 210, 3 N.E. 2d 301; *Aetna*

*Trust & Savings Co. v. Nackenhorst,* 188 Ind. 621, 122 N.E. 421; (2) compensation for the receiver, G.S. 55-155, *Cotton Mills v. Cotton Mills,* 115 N.C. 475, 20 S.E. 770; (3) compensation for the receiver's attorney, *Graham v. Carr,* 133 N.C. 449, 45 S.E. 847; (4) bookkeeping and clerical expense, *Nettles Grocery Co. v. Frederick Bros.,* 167 La. 359, 119 So. 256; (5) auditing expense, *Pennsylvania Engineering Works v. New Castle Stamping Co.,* 259 Pa. 378, 103 A. 215; (6) premiums for fire insurance on property in receivership, *Nettles Grocery Co. v. Frederick Bros., supra; Bailey v. Bailey,* 262 Mich. 215, 247 N.W. 160; (7) compensation for watchmen for services in guarding property in receivership, *Nettles Grocery Co. v. Frederick Bros., supra;* and (8) costs of sale of property in receivership, *City Item Co-op. Printing Co. v. Phoenix Furniture Concern,* 108 La. 258, 32 So. 469.

But obligations incurred by a receiver for labor, materials or services in carrying on and operating the business of an insolvent private concern owing no duty to the public are entitled to preference over the claims of general creditors arising before the receivership. *Nettles Grocery Co. v. Frederick Bros., supra; Renberg v. Thede,* 132 Okl. 247, 270 P. 62; *Prenatt v. Messenger Printing Co.,* 250 Pa. 406, 95 A. 564; *Friedheim v. Crescent Cotton Mill,* 64 S.C. 277, 42 S.E. 119; *Hornby v. Hornby,* 71 S.D. 418, 25 N.W. 2d 237; 75 C.J.S., Receivers, section 292. Such obligations are charged first upon income, and when that is insufficient, against the property of the insolvent concern or the proceeds of sale of such property. *Hornby v. Hornby, supra.*

The task of applying these rules to the case at bar must now be performed. W. R. Makepeace is entitled to priority of payment of his claim in full with accrued interest from the $12,000.00 derived from the sale of the personal property mortgaged to him, and O. B. Taylor is entitled to priority of payment of his claim to the extent of $795.00 without interest from the $795.00 obtained by the sale of the personal property covered by his mortgage. The eleven appealing judgment creditors and the six contractors are entitled to priority of payment of their several judgments with accrued interest and costs in the order of their docketing from the cash realized from the sale of the apartment house, the factory and the farm. The claims of the six contractors are payable, however, out of the proceeds of the apartment house alone until the exhaustion of such proceeds compels resort to the sale prices of the factory and farm. After the allocation of the amounts herein mentioned to the two mortgagees, the six contractors, and the eleven appealing judgment creditors, the claim of the United States for income taxes is entitled to priority of payment out of the remainder of the proceeds realized from the sale of both the real and the personal property.

When the liens antedating the receivership have been satisfied in the manner stated in the preceding paragraph, the receiver will have approximately $33,603.15 left in his hands. He should then apply this sum upon these claims and costs in this order of preference:

1. The costs of administration, which consist of the allowances specified in paragraph 17 of the statement of facts and the wages due the watchman for his services in guarding the property pending its sale. G.S. 55-155; *Humphrey v. Lumber Co.*, 174 N.C. 514, 93 S.E. 971.

2. The claims of the United States for Federal employment and social security taxes, which accrued during the receivership. *Spokane County v. United States*, 279 U.S. 80, 49 S. Ct. 321, 73 L. Ed. 621.

3. The claims of Moore County, the Town of Carthage, and the Town of Pinebluff for county and municipal property taxes which were assessed during the receivership. G.S. 55-160, 105-340, 105-376, and 105-412.

4. The claim of North Carolina for contributions under the State Employment Law, which arose during the receivership. G.S. 96-10 (c); *Tildesley Coal Co. v. American Fuel Corporation, supra.*

5. The claims for labor, materials, and services, which accrued during the receivership and are mentioned in paragraph 10 of the statement of facts. These claims embrace those of the Esso Standard Oil Company, the Gouger Electric Company, and all the laborers hired by the receiver other than the watchman.

The receiver will necessarily be compelled to pay the claims for labor, materials and services accruing during the receivership *pro rata* because the money in hand will not suffice to discharge them in full. 75 C.J.S., Receivers, section 283.

Inasmuch as the outlays just enumerated will exhaust the fund, nothing will be available for application to the remaining portion of the debt due O. B. Taylor, the claims of the twenty non-appealing judgment creditors, and the claims of the forty-eight general creditors antedating the appointment of the receiver. The claim of York Mills is included in the claims which do not share in the fund.

In reaching our decision, we have not ignored the claim of the United States for damages for supposed breaches of contract, or the contentions pressed upon us by counsel for the Esso Standard Oil Company, the Gouger Electric Company, the laborers employed by the receiver, and the York Mills.

We will note our conclusions on these matters seriately.

When the United States comes into court to enforce its rights, it comes as any other suitor, and is subject to the rules governing like litigation between private parties. *Curtner v. United States*, 149 U.S. 662, 13 S. Ct. 985, 37 L. Ed. 890; *United States v. O'Grady*, 22 Wall. 641, 22

L. Ed. 772; *Brent v. Bank of Washington, supra; Mitchel v. United States,* 9 Pet. 711, 9 L. Ed. 283.

The United States filed a claim with the receiver for damages totaling $88,550.72 for supposed breaches of contracts allegedly made by the receiver with governmental agencies. The receiver allowed the claim as an unpreferred one, and the United States and certain other claimants excepted to this ruling. The United States asserted that the receiver erred in refusing to accord its claim high priority while the other claimants challenged the validity of the claim in its entirety.

Although the other claimants waived jury trial on their exceptions by failing to demand such trial in the mode prescribed by G.S. 55-153, it was incumbent on the United States to establish its claim by proper evidence before the presiding judge in conformity with the practice which prevails in civil cases where trial by jury is waived. *Surety Corp. v. Sharpe,* 232 N.C. 98, 59 S.E. 2d 593. Moreover, it was the duty of the presiding judge to demand the production of such evidence, and to make appropriate findings of fact from it before rendering judgment in favor of the United States on the claim. G.S. 1-185; *Woodard v. Mordecai,* 234 N.C. 463, 67 S.E. 2d 639.

Despite these considerations and the additional circumstance that the claim was increased in amount from $88,550.72 to $176,790.55 by amendment in the Superior Court, the United States offered no evidence before the presiding judge to prove its claim, and the presiding judge made no findings of fact warranting a decision for the United States on the claim. Since these defects appear on its face, the record discloses the lack of a factual foundation for the claim, and in consequence does not support the adjudication that the United States has a valid claim against the receiver for damages totaling $176,790.55 for breaches of contracts made by the receiver with governmental agencies. For this reason, the exceptions to the adjudication are sustained, the claim is disallowed, and we forego consideration of the question whether the claim would have been valid in law had it been established in fact.

The law declares that "preferences are not favored . . . and can only arise by reason of some definite statutory provision or some fixed principle of common law which creates special and superior rights in certain creditors over others." *Power Co. v. Yount,* 208 N.C. 182, 179 S.E. 804.

The Esso Standard Oil Company asserts that its claim is entitled to priority over the pre-existing liens and the impliedly authorized obligations contracted by the receiver in operating the business of the Carthage Weaving Company merely because the court entered a prior order without notice to other creditors expressly authorizing the receiver to buy its product as a material "needed in the carrying out of a contract" made during the receivership. The Esso Standard Oil Company bases this

contention on the proposition that a fixed principle of law gives operating expenses incurred by a receiver "pursuant to express order of the court" preference over pre-existing liens and impliedly authorized operating expenses, and cites *Armour v. Laundry Company,* 171 N.C. 681, 89 S.E. 19, as authority for that proposition.

Candor compels the confession that the *Armour case* is somewhat lacking in the clarity desirable in judicial opinions. In our judgment, however, the *Armour case* does not sanction the proposition that when it permits a receiver to carry on the business of an ordinary insolvent private concern, the court either can or does give a particular operating expense preference over pre-existing liens and impliedly authorized operating expenses in the distribution of the *corpus* of the property of the concern by conferring its express authorization on the contracting of the particular operating expense. We are unwilling to concede that the law is so disloyal to reason as to found such a substantial distinction on such an insubstantial difference.

As we interpret it, the *Armour case* merely recognizes and applies these orthodox rules relating to receiverships: (1) That expenses incurred by a receiver in the preservation of the property in receivership are chargeable against the interests of pre-existing lienholders where unencumbered assets are not available for the payment of such expenses; and (2) that expenses contracted by a receiver in carrying on and operating the business of an ordinary insolvent private concern are subordinate to the rights of non-consenting lienholders. The indebtedness represented by the receiver's certificates was entitled to priority over the liens and operating expenses because "it was necessary for the protection (*i.e.,* the preservation) of the fund."

The Gouger Electric Company and the laborers employed by the receiver other than the watchman contend that the statutory provision now codified as G.S. 55-136 gives their claims priority over those of the other claimants. This statute is as follows:

"In case of the insolvency of a corporation, partnership or individual, all persons doing labor or service of whatever character in its regular employment have a lien upon the assets thereof for the amount of wages due to them for all labor, work, and services rendered within two months next preceding the date when proceedings in insolvency were actually instituted and begun against the corporation, partnership or individual, which lien is prior to all other liens that can be acquired against such assets: Provided, that the lien created by this section shall not apply to multiple unit dwellings, apartment houses, or other buildings for family occupancy except as to labor performed on the premises upon which the lien is claimed. This section shall not apply to any single unit family dwelling."

The claims of the laborers are for wages due them for work done for the receiver during the receivership, and in consequence can not qualify for a preferred status under G.S. 55-136. The statute does not apply to any wages except those due persons in the regular employment of an insolvent corporation, partnership or individual "for labor, work, and services rendered within," *i.e., inside the limits of,* "two months next preceding the date when proceedings in insolvency were actually instituted and begun against the corporation, partnership or individual." We cannot accept as valid the suggestion contained in *Walker v. Lumber Co.,* 170 N.C. 460, 87 S.E. 331, that the word "within" means "subsequent," and that the statute, therefore, gives laborers "a first lien" for all their wages accruing "after 60 days prior to the insolvency," notwithstanding the supervening receivership. This suggestion cannot be reconciled with the meaning attributed to the word "within" by judicial decisions and lexicographers. 69 C.J. 1314. Moreover, it ignores the plain legislative purpose not to extend the protection of the statute to persons in the employment of the receiver as contradistinguished from persons in the employment of the insolvent corporation, partnership or individual. Furthermore, it conflicts with the construction either expressly or impliedly put on the statute by all other relevant decisions. *Leggett v. College, supra; In re Port Publishing Co.,* 231 N.C. 395, 57 S.E. 366, 14 A.L.R. 2d 842; *Lumber Co. v. Phosphate Co.,* 189 N.C. 206, 126 S.E. 511; *Humphrey v. Lumber Co., supra; Roberts v. Manufacturing Co., supra; Riley v. Sears,* 156 N.C. 267, 72 S.E. 367, and 151 N.C. 187, 65 S.E. 912.

The Gouger Electric Company is an independent concern which repaired machinery belonging to the Carthage Weaving Company on a single occasion during the receivership at a contract price fixed by mutual agreement between it and the receiver. The claim based on such service could not constitute a preferred one under G.S. 55-136 even if the service had been rendered to the insolvent concern itself within two months next preceding 9 July, 1949, the date of the commencement of this action. The statute applies only to "wages due . . . persons doing labor or service . . . in (the) . . . regular employment" of another. The Gouger Electric Company is due the unpaid contract price—not wages. *Iron Co. v. Bridge Co.,* 169 N.C. 512, 86 S.E. 184. Moreover, its claim is based on a single piece of work. It was not hired to do permanent or steady work in the usual course of the occupation of another. This being true, it did not render the service in the regular employment of another. *Peroni v. Farley,* 14 N. J. Misc. 86, 182 A. 353; *State ex rel. Bettman v. Christen,* 128 Ohio St. 56, 190 N.E. 233; *Reese v. Industrial Commission of Ohio,* 55 Ohio App. 76, 8 N.E. 2d 567.

The York Mills held an unsecured claim against the Carthage Weaving Company at the time of the appointment of the receiver. Subsequent to that event, to wit, on 18 May, 1950, the York Mills reduced such claim to judgment in an independent action against the defendants Van B. Sharpe and Louise R. Sharpe, and caused such judgment to be forthwith docketed on the judgment docket of the Superior Court of Moore County. The record does not indicate that the prosecution of the independent action was authorized by an order in this cause, or that the receiver had any notice of its pendency.

Counsel for the York Mills insist with much earnestness that this judgment entitles their client to a preferred status in the distribution of the money now in the hands of the receiver. It might be argued with much force that this contention is untenable under the doctrine that the right of a pre-existing creditor to a preference in receivership proceedings is fixed as of the date of the appointment of a receiver, and that if a pre-existing claimant is not preferred at such time he may not secure a preference by anything done thereafter. 75 C.J.S., Receivers, section 283.

Be this as it may, it is obvious that the contention of the York Mills is not maintainable for other reasons. The York Mills did not acquire any lien under the judgment on any of the property owned by the defendants as partners because such property vested in the receiver prior to the rendition of the judgment. G.S. 55-149; *Hardware Co. v. Holt,* 173 N.C. 308, 92 S.E. 8. The present record spares us the task of determining whether or not the judgment gave the York Mills a lien on the apartment house or any other real property owned by the defendants as individuals. This is true for the very simple reason that the liens antedating the receivership and the costs and expenses incurred by the receiver in carrying on and operating the business will exhaust all the money in the hands of the receiver, including the proceeds of the apartment house. The claim of the York Mills is subordinate in any event to these liens, costs, and expenses because the liens are senior to such claim, and the costs and expenses were incurred with the acquiescence of the York Mills. It is well settled that costs and expenses incurred by a receiver with the express or implied consent of a lienholder are preferred to the claim of such lienholder. 75 C.J.S., Receivers, section 292.

The presiding judge rightly refrained from giving the receiver any directions concerning the disbursement of any surplus which might arise on the foreclosure of the deed of trust covering the dwelling in Pinehurst. It is a well settled rule in equity that a court will not instruct a receiver as to the distribution of funds until he has them in hand. *Strauss v. Building & Loan Association,* 117 N.C. 308, 23 S.E. 450, 52 Am. S. R. 585, 30 L.R.A. 693.

The order of distribution is modified to conform to this opinion. As thus modified, it is affirmed.

Modified and affirmed.