Decker Estate (No. 1).

Argued October 3, 1946. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

reargument refused January 6, 1947.

*Carl J. Batter,* with him *R. Palmer Ingram, Gifford K. Wright* and *Alter, Wright & Barron,* for appellants.

*Ferdinand T. Weil,* with him *S. Allen Vatz, Robert C. Hecht* and *Weil, Hirsch & Shumaker,* for appellees.

OPINION BY MR. JUSTICE HORACE STERN, November 25, 1946:

We are here concerned with a controversy over priorities in the distribution of a fund in the possession of an ancillary administrator of a decedent's insolvent estate. The contesting parties are, on the one hand, two creditors who claim the fund as the proceeds of collateral security for moneys due them, and, on the other, the executors of the estate and the widow of the decedent who are championing a demand of the

federal government for preferential payment of unpaid income and estate taxes.

The decedent, Josef Ben Decker, a resident of Maryland, died April 5, 1944. He had been an employe of Triumph Fusee and Fireworks Company, a corporation, the name of which was subsequently changed to Triumph Explosives, Inc. Gustav H. and William L. Kann, citizens of Pennsylvania, were substantial stockholders in that company.

Two transactions were entered into between Decker and the Kanns. The first of these consisted of a contract dated July 10, 1937, wherein the Kanns agreed to sell to Decker and the latter agreed to buy from them 200 shares of the stock of the company for $100 per share, the purchase price to be payable only out of dividends and Decker to be under no obligation to pay for the stock except in that manner. Interest was to run at the rate of four per cent per annum on unpaid balances. The certificates were to be issued in the name of Decker, were to be endorsed by him in blank and delivered to the Kanns to be held by them as collateral security for the payment of the purchase price and the interest thereon. In the event that Decker should at any time cease to be an employe of the company the Kanns were to have the right to repurchase the stock; if he should die while in the employ of the company, or within thirty days after the termination of such employment, the Kanns were to be obligated to purchase the stock from his estate within six months after his death at a price to be determined in a manner specified in the agreement.

In accordance with the terms of the contract the stock was issued, endorsed by Decker, and deposited with the Kanns. Shortly thereafter the company exchanged all its then outstanding stock, which had a par value of $100 a share, for new stock with a par value of $2. per share, on the basis of 30 shares of new stock

for one share of the old; 6,000 shares of new stock were thus substituted for the original 200 shares held by the Kanns under the agreement. At the time of Decker's death the balance due the Kanns was $10,700.

The second transaction which figures in the present controversy consisted of a contract dated December 12, 1941, between the Kanns, Decker and two other persons. This agreement recited that the company had granted to the Kanns an option to purchase up to 50,000 shares of its stock at a price of $3. per share, with the right on their part to distribute these options among officers, directors and employes; that the Kanns had allotted to Decker and the two others the right to subscribe to certain quantities of the stock at that price, Decker's allowance being 7,166 shares; that the other parties had requested the Kanns to negotiate a loan with the Peoples-Pittsburgh Trust Company on their behalf, the proceeds to be used to enable them to exercise their subscription rights; that the Kanns had accordingly negotiated such a loan in the amount of $92,000 on condition that they, the Kanns, were to give the Trust Company their note in that amount with interest at 4% per annum to be secured by satisfactory collateral to be furnished by them, the stock which was being purchased by the parties to the agreement to be held by the Trust Company as additional collateral; that the parties other than the Kanns were not to be required to furnish any collateral other than the stock; and that they all desired to carry out the terms and conditions of the loan so as to protect the Kanns from any and all liability other than that arising from the Kanns' own participation, and to protect the collateral pledged as security for the loan. Accordingly, each of the other parties agreed that upon receiving their respective allotments of the stock they would endorse the certificates in blank and deliver them to the Kanns; that they would pay their shares of the interest; that they would

forthwith deliver to the Kanns their demand promissory notes for the amounts of their respective participations in the total indebtedness; and that, to the extent of such participations, they would indemnify the Kanns and save them harmless from any damage, loss or expense incurred by them in connection with the loan transaction. Upon the payment in full by any party of his share of the total obligation there was to be delivered to him all his stock and notes still in the possession of the Kanns or the Trust Company. The agreement was to be binding upon the heirs, executors, administrators and assigns of the parties.

In accordance with the terms of this contract the Kanns borrowed the $92,000 from the Peoples-Pittsburgh Trust Company, themselves furnishing all the necessary collateral without their being required to deposit with the Trust Company the stock itself as additional security. Decker delivered to the Kanns certificates for the 7,166 shares which had been made out in his name and endorsed by him in blank.

As a result, then, of these two transactions the Kanns held in their possession negotiable stock certificates of Decker to the extent of 13,166 shares.

Stockholders of Triumph Explosives, Inc., having entered into a voting trust agreement under which the Peoples-Pittsburgh Trust Company was to be the voting trustee, the Kanns obtained from Decker a letter, dated October 31, 1942, in which he authorized them to deposit with the voting trustee the 13,166 shares, "7,166 shares of which are held by you under the terms of agreement dated December 12, 1941 . . . and 6,000 shares of which are held by you under the terms of an agreement . . . dated July 10, 1937; and to accept from such voting trustee in place and stead of such stock, voting trust certificates, which you are to hold in lieu of the stock under the terms of the aforesaid agreements."

The Kanns deposited the Decker stock with the Trust Company in pursuance of the voting trust, and, under date of July 20, 1943, the voting trustee issued two voting trust certificates in Decker's name, one for the 6,000 shares of stock and one for the 7,166 shares. Because, however, of a writ of foreign attachment being issued on some claim of Triumph Explosives, Inc., against Decker and served on the voting trustee as garnishee, the details of which proceeding are here unimportant, the voting trust certificates were not delivered to the Kanns until some time after June 21, 1944. Decker having meanwhile died, his endorsements of the certificates could not, of course, be obtained.

The administration of Decker's estate was conducted in Maryland, but, on petition of the Kanns, the Orphans' Court of Allegheny County granted ancillary letters of administration to the Union Trust Company of Pittsburgh, to which the Kanns delivered the voting trust certificates under agreement that such delivery was to be without prejudice to their rights; the Kanns further agreed that the ancillary administrator should sell the certificates, "the proceeds from the sale of said collateral to be considered in all respects as taking the place of the collateral." Accordingly the voting trust certificates were sold, and the sum realized, together with some undistributed dividends turned over by the voting trustee [1] to the ancillary administrator, and amounting in all to $41,425.26, constitutes the fund which was before the Orphans' Court for distribution in these proceedings. Of this fund the Kanns claimed $10,700 with interest, that being the balance remaining unpaid under the agreement of July 10, 1937, and $20,064.80 with interest, which was the balance remaining

---

[1] The voting trustee was then the Fidelity Trust Company of Pittsburgh which had succeeded the Peoples-Pittsburgh Trust Company in that capacity.

due to the Kanns for Decker's share of the indebtedness to the Peoples-Pittsburgh Trust Company under the agreement of December 12, 1941, the Kanns having repaid the loan of $92,000 to that company on November 12, 1943. On the other hand, the executors and the widow of decedent contended that the Kanns were not secured creditors at all, and that two claims of the federal government were entitled to priority, one of $11,979.80 and interest for the income tax of decedent for the year 1941, and one of $22,013.15 and interest for decedent's estate tax. The Orphans' Court decided in favor of the Kanns, and awarded to them the sum of $36,434.43, representing their claims with interest to the date of the sale of the collateral by the ancillary administrator. This, after certain allowances for counsel fees, left a balance in the fund of $2,464.33, which the court ordered should be remitted to the domiciliary executors in Maryland. The latter, together with decedent's widow, are now appealing from that decision.

The first question for determination is in regard to the original and the continuing status of the Kanns as pledgees with respect to the stock delivered to them by Decker under the terms of their two contracts. The delivery of stock certificates endorsed in blank, to be held as collateral for the payment of a loan or other obligation, vests in the holder the rights of a pledgee; his title as such is valid even though the stock is not transferred on the books of the corporation: *Citizen's National Bank of Irwin v. Irwin Building and Loan Association,* 316 Pa. 536, 175 A. 399. However, as to the contract of July 10, 1937, appellants contend that it was broken by the Kanns because they did not purchase from the estate the 6,000 shares of stock as they were obligated to do in case he should die while in the employ of Triumph Explosives, Inc., or within thirty days after such employment was terminated. The trouble with

appellants' position in this regard is that the burden was upon them to prove that Decker did die within the period thus specified, but they offered no evidence for that purpose. Instead, they merely relied upon the proposition that, since it was admitted that Decker had been an employe of the company, the continuance of such employment until his death was to be presumed in the absence of any evidence to the contrary. But presumptions may not be resorted to for the purpose of establishing facts of which, as here, direct proof can readily be obtained, and the fact as to when Decker resigned was certainly within the knowledge of appellants. It was stated at bar by counsel for the Kanns, and without contradiction, that Decker died more than a year after terminating his employment. It must be concluded, therefore, that there is no ground for the charge that the Kanns defaulted on their agreement of July 10, 1937.

Coming now to the contract of December 12, 1941, it is appellants' contention that the 7,166 shares of stock were delivered to the Kanns, not as collateral security under that agreement for any obligation of Decker to the Kanns, but only to enable them to deposit the stock as collateral with the Peoples-Pittsburgh Trust Company, and, since it transpired that the stock was not required for that purpose, Decker was entitled to its return. Upon reading the agreement, however, as an entirety, it is clear that this stock was to serve as collateral security for Decker's proportionate share of the general obligation of $92,000 as represented by the note of $21,498 which the agreement provided he should deliver, and which he did deliver, to the Kanns. He contracted to indemnify and save the Kanns harmless from their liability under the loan transaction to the extent of his participation in the total indebtedness, and until he paid his share of the loan, whether directly to the Trust Company or to reimburse the Kanns, he was

not entitled to a return of the stock certificates. That the Kanns were entitled to retain the stock as security is confirmed by Decker's letter of October 31, 1942, from which it appears that he knew that the stock had not been deposited with the Trust Company as collateral for the general loan which had long before been negotiated, but was in the possession of the Kanns, and he conceded that they were rightfully holding it under the agreement of December 12, 1941, and were to continue to hold, in lieu of the stock, the voting trust certificates for which the stock was to be exchanged.

Some time after October, 1942, all the stock was delivered by the Kanns to the Peoples-Pittsburgh Trust Company as voting trustee. Appellants say that by thus parting with possession the Kanns abandoned their rights as pledgees of the stock. However, not only were the stock certificates turned over to be exchanged for voting trust certificates with the written consent and authority of Decker—an irrevocable consent which, because of Kanns' interest, could in no way be affected or impaired by his subsequent death—but they were surrendered by the Kanns only for the purpose of conversion into voting trust certificates, no alteration whatever in the rights of the parties being thereby contemplated. The change thus effected in the collateral security was one of form rather than of substance. Nor is it of any legal importance that when the certificates were delivered by the voting trustee they were in the name of Decker instead of in the name of the Kanns, for whatever the error thus committed it was one made by the voting trustee and therefore could not affect the respective rights of the parties in the certificates. If Decker had been then alive, the Kanns could, of course, have compelled him, by proceeding in equity, to endorse the certificates over to them had he refused voluntarily to put the voting trust certificates in the same negotiable

form as that of the stock certificates for which they had been exchanged.

We conclude, therefore, that the Kanns originally obtained, and never subsequently lost, the rights of pledgees of the stock received from Decker under the agreements both of 1937 and 1941, and that those rights were continued in the voting trust certificates, the proceeds of the sale of which constitutes the present fund for distribution.

This brings us to the remaining question in the case, which is whether the United States is entitled, in the collection of its tax claims, to priority over the rights of the Kanns in the fund thus realized.

Section 3466 of the Revised Statutes, U. S. C. A. Title 31, Section 191, which harks back in its origins to the year 1797, provides that whenever any person indebted to the United States is insolvent, or whenever the estate of any deceased debtor is insufficient to pay all the debts due from the deceased, the debts due to the United States shall be first satisfied. There has been considerable controversy, in connection with the interpretation of this section, as to whether the priority which it conferred upon debts of the United States was intended to be superior to the rights of mortgagees, pledgees and holders of perfected judgment liens: see *United States v. Guaranty Trust Co. of New York,* 33 Fed. 2d 533, 536, 537; *New York v. Maclay,* 288 U.S. 290, 293, 294; *United States v. Knott,* 298 U.S. 544, 549; *United States v. Texas,* 314 U.S. 480, 484-486; *United States v. Waddill Holland & Flinn, Inc.,* 323 U.S. 353, 355, 356. But we need not enter upon a discussion of that question which, as far as the present case is concerned, is academic, since the Act of June 29, 1939, c. 247, Title IV, Section 401, 53 Stat. 882, U.S.C.A. Title 26, Section 3672(b)(1), now provides that tax liens in favor of the United States shall not be valid with respect to a se-

curity [2] as against any mortgagee, pledgee, or purchaser, of such security, for an adequate and full consideration in money or money's worth, if at the time of such mortgage, pledge, or purchase such mortgagee, pledgee, or purchaser is without notice or knowledge of the existence of such lien. Accordingly, the law has now removed all doubt that the rights of a pledgee which accrue before the attaching of a federal tax lien, and necessarily therefore without notice or knowledge thereof, are not affected thereby: cf. *Meyer Estate,* 159 Pa. Superior Ct. 296, 48 A.2d 210; *Manufacturers Trust Co. v. Sobel,* 26 N.Y.S. 2d 145; *United States v. Record Publishing Co.,* 60 Fed. Supp. 194. It is urged by appellants that Section 3672 of the Internal Revenue Code, 56 Stat. 957, U.S.C.A. Title 26, Section 3672, should not be construed as overriding Section 3466 of the Revised Statutes but as being limited to solvent debtors whereas Section 3466 relates to insolvent debtors. It is obvious, however, that such a construction of Section 3672 would be quite unreasonable, since there could be no need or reason for such legislation if intended to provide merely for relative priorities in the distribution of the assets of solvent debtors. Section 3672(b)(1) establishes the paramountcy of the Kanns' rights as pledgees, for, although the government lien for estate taxes is upon the decedent's gross estate (53 Stat. 128, U.S.C.A. Title 26, Section 827), that lien is, by the express provision of Section 3672(b)(1), invalid with respect to such pledgees. The effect of that section is that property pledged under the conditions therein specified is subject to a government lien for taxes only to the extent of the debtor's equity in such property.

Decree affirmed; costs to be paid out of the fund for distribution.

---

[2] The term "security" is defined as meaning, inter alia, any bond, note, certificate, or other evidence of indebtedness, issued by any corporation, share of stock, voting trust certificate, negotiable instrument, or money.