426 A.2d 1098

In re ESTATE of Adolph P. BERRETTA, Deceased.

UNITED STATES of America, Appellant,

v.

The WYOMING NATIONAL BANK OF WILKES-BARRE,
Appellee.

Supreme Court of Pennsylvania.

Argued Jan. 26, 1981.

Decided March 13, 1981.

S. John Cottone, U.S. Atty., Joseph F. Cimini, Asst. U.S. Atty., Lackawanna Co., for appellant at No. 11 and appellee at No. 22.

Stephen E. Sokolic, M. Carr Ferguson, Gilbert E. Andrews, Francis J. Gould, Thomas M. Lawler, Washington, D.C., Charles A. Shea, III, Wilkes-Barre, for appellee at No. 11 and appellant at No. 22.

Before O'BRIEN, C. J., and ROBERTS, NIX, LARSEN, FLAHERTY and KAUFFMAN, JJ.

## ORDER

PER CURIAM:

The Court being equally divided, the decree of the orphans' court is affirmed. Each party pay own costs.

Mr. Justice Flaherty filed an Opinion in Support of Affirmance in which Mr. Justice Larsen and Mr. Justice Kauffman join.

Mr. Justice Roberts filed an Opinion in Support of Reversal in which Mr. Chief Justice O'Brien and Mr. Justice Nix join.

## OPINION IN SUPPORT OF AFFIRMANCE

FLAHERTY, Justice.

This appeal involves a determination of the relative priority of the claim of the Wyoming National Bank of Wilkes-Barre (hereinafter referred to as the bank) and the United States to certain proceeds remaining from the sale of two

parcels of real property included in the insolvent estate of the taxpayer, Adolph P. Berretta.

In its initial adjudication and decree, entered on July 6, 1978, the Court of Common Pleas of Luzerne County Orphans' Court Division directed that the proceeds be paid in partial satisfaction of the claim of the United States. The bank, on July 14, 1978, filed exceptions to this original adjudication. Thereafter, on December 11, 1978, the court reversed its prior decision and, in another decree and adjudication, ordered that the proceeds from the sales of Berretta's real properties be paid to the bank to satisfy its claim against the estate. On January 10, 1979, the United States filed a timely notice of appeal. The bank, on January 17, 1979, filed a cross-appeal.

The facts pertinent to this appeal are as follows:

Berretta died testate on February 11, 1974. The bank was appointed administrator of his estate. The estate does not have sufficient assets to pay all valid claims of indebtedness and is thus insolvent. However, among the assets of the estate were two parcels of real property located in Luzerne County.

The bank had claims against Berretta's estate by virtue of two outstanding mortgages and bonds, which encumbered the two parcels of real property included in the estate. The bank also held a judgment note for $10,000, which was executed on August 31, 1971. It is the judgment lien arising from this note that is in competition with the federal tax claim. The note was entered as a judgment in the Prothonotary's Office of Luzerne County on January 24, 1974. By virtue of the filing and indexing of this judgment, the bank attained the status of a judgment lien creditor.[1] The debt on the note has an outstanding balance of $7,408.02.

1. Rule 2951 of the Pennsylvania Rules of Civil Procedure authorizes the prothonotary to enter judgment by confession as in the case of the instant judgment note. Entry and indexing of such a judgment constitutes a lien upon the real property of the confessor situated in the county. 42 Pa.C.S.A. § 4303.

The decedent was the sole proprietor of Berretta Construction Company and had established a commercial line of credit with the bank. The security for the line of credit was a series of three mortgages, the first of which was the March 1, 1961 mortgage to The First National Bank of Exeter, which was acquired through merger by The Wyoming National Bank of Wilkes-Barre. Pursuant to the approved line of credit, the bank made various advances to the decedent on the basis of demand judgment notes, which were periodically consolidated and refinanced with subsequent mortgages; the first of the refinancing mortgages being dated December 3, 1964; the second, April 11, 1972.

The three mortgages reflected loans in face amounts of sixteen thousand eight hundred dollars ($16,800.00) in 1961, thirty thousand dollars ($30,000.00) in 1964, and sixty thousand dollars ($60,000.00) in 1972. When the government's tax liens were entered, both the 1961 mortgage and the 1972 mortgage were unsatisfied as of record.

The United States filed a proof of claim with the bank, as administrator of the insolvent estate, on June 10, 1974. The claim of the United States is for federal employment taxes, interest and penalties assessed against Berretta, in the total amount of $63,291.54, for the quarterly periods from January 1, 1973, through March 3, 1974. Notice of federal tax liens were filed with the Prothonotary's Office, Luzerne County, on January 28, 1974, with respect to the taxes for the first three quarters of 1973, and on April 26, 1974, with respect to the taxes due for the fourth quarter of 1973 and the first quarter of 1974. It is under the authority of the Federal Tax Lien Act of 1966, 26 U.S.C. §§ 6322, 6323, that the United States filed such notice. This filing serves as notice to four named classes of creditors that a federal tax lien exists, and the tax lien is not effective against these four classes until such notice is filed. Judgment lien creditors are among the four protected classes. As to other creditors, not specifically protected by the statute, the tax lien is effective upon mere assessment without the necessity of filing.

By decree of the court, dated October 22, 1974, the two real properties included in Berretta's estate were sold free and clear of all liens. The liens of the claimants against the estate were to attach to the proceeds of these two sales in the same order of priority as such liens had previously attached to the real properties.[2] The proceeds of the sale were, accordingly, first used to satisfy the outstanding mortgages on the properties held by the bank and also to satisfy a mortgage on one of the properties which was held by the Small Business Administration. After the payments of these mortgages, which are not in issue in this case, $7,633.35 in sales proceeds remained in the estate for distribution to other creditors. The United States did not contest the payment of these mortgages.

Both the bank and the United States claimed entitlement to these sales proceeds. The bank's claim was to satisfy the balance due on the judgment note of August 31, 1971. The United States made claim to all proceeds remaining in the estate, under Revised Statutes, Section 3466, The Federal Insolvency Statute, because the estate was insolvent. The Insolvency Statute, 31 U.S.C. § 191, provides:

> Whenever any person indebted to the United States is insolvent, or whenever the estate of any deceased debtor, in the hands of the executors or administrators, is insufficient to pay all the debts due from the deceased, the debts due to the United States shall be first satisfied; and the priority established shall extend as well to cases in which a debtor, not having sufficient property to pay all his debts, makes a voluntary assignment thereof, or in which the estate and effects of an absconding, concealed, or absent debtor are attached by process of law, as to cases in which an act of bankruptcy is committed.

On June 10, 1976, the bank, as administrator, filed its First and Final Account and Petition for Adjudication, requesting the court to determine the conflicting claims of it

2. The Orphans' Court has jurisdiction to decree the sale of real property titled to the decedent at date of death free and clear of liens to pay the debts of the decedent and expenses of probate. 20 P.S. § 711. See *Reynold's Estate*, 195 Pa. 225, 45 A. 726 (1900).

and the United States to the sale proceeds which remained in the estate. Since the estate was insolvent, the United States asserted its statutory right to first payment under the Federal Insolvency Statute.

The bank, on the other hand, argued it had priority to payment of the sales proceeds under two alternative theories. First, the bank contended its claim constituted a "specific lien" and thus came within a narrow case law exception to the Federal Insolvency Statute. *Thelusson v. Smith*, 2 Wheat. 396, 426, 4 L.Ed. 271 (1817), held that a lien was sufficiently specific and perfected to be excepted from the operation of the Federal Insolvency Statute if the debtor mortgaged the property to secure the debt, or otherwise divested himself of title to or possession of the property before the insolvency. The bank alleged that it came within this "specific lien" exception to the Federal Insolvency Statute because the debt secured by the note of August 31, 1971, was also secured by the bank's mortgages on the two parcels of Berretta's real properties. Thus, the funds due under the note, according to the bank, were also due under the mortgages because of the "collateral security" or "dragnet" clauses contained in those mortgages.

The bank's alternative position was that, even if it did not have a "specific lien" which was excepted from the priority of the United States under the Federal Insolvency Statute, Section 6323 of the Internal Revenue Code of 1954 (26 U.S.C. § 6323) impliedly repealed the insolvency statute as to tax debts. Section 6323 provides in pertinent part:

(a) Purchases, holders of security interests, mechanic's lienors and judgment lien creditors.—The lien imposed by section 6321 shall not be valid as against any purchaser, holder of a security interest, mechanic's lienor, or judgment lien creditor until notice thereof which meets the requirements of subsection (f) has been filed by the Secretary or his delegate.

The bank urged that its judgment lien was superior to any tax claim of the United States because, under Section 6323, the holder of a properly entered judgment lien has priority

over a subsequently filed tax lien, and the bank's judgment note was entered on January 24, 1974, before the United States filed either of its tax liens.

In its initial adjudication of July 6, 1978, the court determined that the note of August 31, 1971, was not secured by the terms of any of Berretta's mortgages which were held by the bank and that the bank's claim to the sales proceeds rested solely upon the note reduced to judgment. The court held that this judgment provided the only basis for the bank's claim, and that the bank did not have a "specific lien" since Berretta had not conveyed to the bank prior to his death, by mortgage or otherwise, any property thereby secured. Therefore, the court found that the bank's claim did not come within the exception to the statutory priority afforded claims of the United States under the Federal Insolvency Statute. Therefore, a decree was entered, awarding all the proceeds remaining in the estate to the United States under the Federal Insolvency Statute.

On July 14, 1978, the bank filed exceptions to this adjudication arguing that (1) the court erred in concluding that the judgment entered on the note of August 21, 1971, was not secured by Berretta's mortgages which were held by the bank, and (2) that Section 6323 of the Internal Revenue Code of 1954 impliedly repeals the Federal Insolvency Statute, 31 U.S.C. § 191 as to tax debts owing to the United States.

In ruling on the bank's exceptions to the original adjudication, the court, in its subsequent adjudication of December 11, 1978, dismissed the bank's assertion that Berretta's mortgages to the bank brought within their security the August 31, 1971, judgment note and again held that without such security the judgment entered on the note does not come within the "specific lien" exception afforded by *Thelusson v. Smith, supra,* to the general priority of federal claims established by the Federal Insolvency Statute, 31 U.S.C. § 191.

However, in the December 11, 1978 adjudication, the court went on to reverse its first adjudication by sustaining the bank's exception that the absolute federal priority of Re-

vised Statute 3466 was impliedly repealed by Section 6323 of the Internal Revenue Code as to tax debts owing to the United States. This portion of the second adjudication was based entirely on the precedent of the Superior Court decision in *Meyer Estate*, 159 Pa.Super. 296, 300, 48 A.2d 210, 213 (1946), wherein it was held:

> ... that section 3466 must be construed with section 3186 as amended by section 3672 [now Section 6323 of the Internal Revenue Code] and that it was the intention of Congress to modify the rule in the *Thelusson* case, and place a judgment creditor in the same position as a purchaser or a mortgagee, thus, giving a validity and status to judgment lien creditors not previously possessed.

In its second adjudication, the court stated that it was bound by the *Meyer* decision. Therefore, since the bank reduced its note to judgment before the United States filed either of its tax liens, under Section 6323 of the Internal Revenue Code the bank's claim was entitled to priority over the claim of the United States. The court entered its decree on December 11, 1978, and ordered that $7,503 of the total sales proceeds of $7,633.35 be paid over to the bank. The balance was awarded to the United States.[3] From this decree, the United States appeals.

For the reasons that follow, we would affirm the Court of Common Pleas of Luzerne County, Orphans' Court Division.

I.

The initial question in this case is whether the Federal Tax Lien Statute, § 6323 of the Internal Revenue Code, limits the operation of the Federal Insolvency Statute, Revised Statutes § 3466, 31 U.S.C. § 191, where the government seeks to assert absolute priority under the insolvency

---

**3.** Of the remaining sales proceeds of $7,633.35, the bank's award was composed of $7,408.02 in unpaid principal on the judgment note and interest thereon to the date of the decedent's death. The United States was awarded $1,459.22, which was all the funds remaining in the estate. This sum represents the sales proceeds not paid to the bank, and interest earned by the estate on the total sales proceeds while in the estate.

statute to collect tax lien debts that arise under § 6321 against the insolvent estate of a decedent. In 26 U.S.C. § 6321, a lien is created in favor of the United States in the amount of the tax owed, and such lien applies to "all property and rights to property, whether real or personal, belonging to such person." The effect of the Section 6321 lien is addressed in 26 U.S.C. 6323(a), which provides, *inter alia*, that a tax lien shall not be valid against a judgment lien creditor until proper notice has been filed. The United States contends that, due to the insolvency of the Berretta Estate, federal claims for taxes merit priority under the insolvency statute, 31 U.S.C. § 191, which provides for absolute priority of the United States in the event that the United States must assert its claim against an insolvent decedent's estate.

Section 3466 has been substantially unchanged since the Act of March 3, 1797 ch. 20, § 5, 1 Stat. 515. The bank asserts that the priority statute was superseded with respect to debts arising from unpaid taxes by the provisions of Internal Revenue Code Sections 6321 and 6323(a). Therefore, the bank, by reason of having reduced its note to judgment on January 24, 1974, claims to have acquired a lien interest which was not diminished by the tax liens filed subsequently on January 28, 1974 and April 26, 1974.

In *United States v. Emory*, 314 U.S. 423, 433, 62 S.Ct. 317, 322, 86 L.Ed. 315, 325 (1941), the Supreme Court of the United States noted: "Only the plainest inconsistency would warrant our finding an implied exception to the operation of so clear a command as that of § 3466." Accord, *United States v. Moore*, 423 U.S. 77, 82, 96 S.Ct. 310, 313, 46 L.Ed.2d 219, 224 (1975).[4] The *Emory* case, however, involved a

4. The Superior Court in *Meyer Estate* has addressed the question of inconsistency of these two statutes by using a general principle of statutory interpretation:

It is a familiar principle of statutory construction that a conflict between various statutes is to be avoided and if possible the apparent conflicting provisions must be construed together with the more specific provisions prevailing over the general ones: *Hellmich v. Hellman*, 276 U.S. 233, 48 S.Ct. 244, 72 L.Ed. 544. Applying this rule the general provisions of section 3466 [the

federally guaranteed loan under the National Housing Act. At the insolvency of the debtor, the United States was owed $5988.88 as the guarantor of the loan and claimed priority under § 3466, the Federal Insolvency Statute; the nonfederal parties claimed "about $900" for wages. In holding that § 3466 and the National Housing Act are not plainly inconsistent, the Court emphasized the fact that there was no provision in the National Housing Act expressly relinquishing the priority of the United States with respect to claims arising under it.[5] 314 U.S. at 430, 62 S.Ct. at 321, 86 L.Ed. at 323. In the present case, however, there is a specific provision in the Tax Lien Act subordinating tax claims of the United States to nonfederal claims that have been filed prior to the filing of the federal claim. In view of this provision of the Tax Lien Act, we would conclude that there is a plain inconsistency between the provisions of the Tax Lien Act and the absolute priority granted the United States by the insolvency statute.

Additionally, we believe that the recent decisions of the Supreme Court of the United States and of some of the federal circuit courts also require the application of the Tax

Federal Insolvency Statute] are limited by specific provisions of section 3672 [current § 6323]. The latter section has greater significance in insolvency cases than the former because in section 3672 payment of a lien is most important.
159 Pa.Super. 296, 304–305, 48 A.2d 210, 215 (1946). We agree with this view of the Superior Court, but would rest our decision as well on the policy considerations set out *infra*.

5. *See also United States v. Key*, 397 U.S. 322, 328–329, 90 S.Ct. 1049, 1053, 25 L.Ed.2d 340, 346–347 (1970). In *Key* the Court found no inconsistency between § 3466 and provisions of Chapter X of the Bankruptcy Act governing corporate reorganization. The Court held that § 199, requiring payment of taxes due the United States, unless waived by the Secretary of the Treasury, and §§ 216(7), 221 establishing an equitable standard to govern payment under a reorganization plan did not conflict with § 3466. In other words, neither the requirement that the United States be paid nor the requirement that the payment be fair and equitable conflicts with the command of § 3466 that the United States be paid first. In the present case, however, there is a necessary conflict between the command of § 3466 that the United States be given first priority and the command of the Tax Lien Act that the claims of the United States be subordinated to specified creditors.

Lien Act in this case.[6] Although a number of federal decisions are relevant to the problem in this case, we focus on *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979) as the most recent expression of the United States Supreme Court on the policy considerations that underlie the question of whether the government, even in the tax arena, is to be treated as an ordinary creditor or as a creditor with super-priority.

In the *Kimbell* case, O.K. Super Markets borrowed $27,000 from Kimbell, a grocery wholesaler, during 1968. Two security agreements identified the supermarket's equipment and merchandise as collateral. These agreements also contained a standard "dragnet" clause which provided that the collateral would secure future advances from Kimbell. Kimbell perfected its security interests by filing financing

6. *See United States v. Randall*, 401 U.S. 513, 91 S.Ct. 991, 28 L.Ed.2d 273 (1971) (specific priorities of the Bankruptcy Act override the general priority of the United States under § 3466); *United States v. S.K.A. Associates, Inc.*, 600 F.2d 513 (5th Cir. 1979) (Small Business Administration lien in an insolvency held not entitled to priority under § 3466); *United States v. Burlington Industries*, 600 F.2d 517 (5th Cir. 1979) (contest between federal agency's security interest and a warehouseman to be decided under nondiscriminatory state law.); *Kimbell Foods, Inc. v. Republic National Bank of Dallas*, 557 F.2d 491 (5th Cir. 1977), aff'd. *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979) (discussed *infra*.)

Although we cite these cases as supportive of the result we would reach today, we realize that less recent United States Supreme Court decisions may be said to support an opposite result. While we do not disregard these cases, we feel that significant Congressional enactments in the federal tax lien area and a tendency in the federal courts to curtail the priority of the United States place the older cases in a less persuasive perspective. *See United States v. Vermont*, 377 U.S. 351, 84 S.Ct. 1267, 12 L.Ed.2d 370 (1964) (in *dictum*: Section 3466 applies to all an insolvent's debts to the government, whether or not arising from taxes.); *United States v. New Britain*, 347 U.S. 81, 74 S.Ct. 367, 98 L.Ed. 520 (1954) (in *dictum*: Section 3466 imposes an absolute priority in insolvency, but not applied because the record did not establish that the debtor was insolvent); *United States v. Gilbert Associates, Inc.*, 345 U.S. 361, 73 S.Ct. 701, 97 L.Ed. 1071 (1953) (United States tax lien held to have priority under § 3466); *United States v. Security Trust and Savings Bank*, 340 U.S. 47, 71 S.Ct. 111, 95 L.Ed. 53 (1950) (in *dictum*: § 3466 permits no exception and applies to all debts of the United States whether or not arising from taxes and whether or not secured by a lien.)

statements according to Texas law. In 1969, O.K. Super Markets obtained a $300,000 loan from Republic National Bank, the bank accepting as security the same property specified in Kimbell's earlier agreements. The bank filed a financing statement to perfect its security interest and the Small Business Administration guaranteed 90% of this loan under the Small Business Act, which does not in this situation specify priority rules to govern the SBA's security interests.

Late in 1970 the bank assigned its security interest to the SBA. This assignment was recorded on January 21, 1971. However, on January 15, 1971 Kimbell had initiated state proceedings against O.K. Super Markets to recover on its inventory debt. On February 3, 1971 O.K. Super Markets, with the approval of its creditors, sold its equipment and inventory and placed the proceeds in escrow. The state court entered judgment against O.K. Super Markets and awarded Kimbell $24,445.37, representing the inventory debt and interest plus attorney's fees.

Kimbell then brought suit in federal court to foreclose on its lien, claiming a security interest in the escrow fund superior to the SBA's interest. The district court, applying the "choateness" principles which the United States Supreme Court had developed to afford federal statutory tax liens special priority over state and private liens where the governing statute does not specify priorities, held for the United States. These priority rules were based on a modification of the "first in time is first in right" idea. The modification was that in order to be first in time the nonfederal lien had to be "choate", or sufficiently "specific" when the federal lien was filed. *United States v. Vermont*, 377 U.S. 351, 84 S.Ct. 1267, 12 L.Ed.2d 370 (1964); *United States v. City of New Britain*, 347 U.S. 81, 74 S.Ct. 367, 98 L.Ed. 520 (1954). The district court found that Kimbell's lien was inchoate at the time the federal lien was filed (apparently because the original loan had been paid and the amount owing was based on future advances), and alternatively, that Kimbell's lien failed because the future advance

clauses in the agreement were not intended to secure debts arising from the subsequent inventory purchases.

The circuit court reversed, holding that the "first in time is first in right" rule should govern competing claims, including United States government claims, and that the choateness rule should not be applied to voluntary loans made by the federal government, as opposed to situations where the government was an involuntary creditor of a tax delinquent. Further, the circuit court held that the future advances clause covered subsequent inventory purchases. Therefore, since Kimbell's claim was properly perfected in 1968 and the government claim did not arise until 1969, and since choateness was not a consideration, Kimbell's claim prevailed over that of the government.

The United States Supreme Court affirmed the circuit court, but modified the lower court's opinion by deciding that the "readymade body of state law," not federal common law, would control priority questions in cases of this sort. The Court held that government lending agencies, absent a congressional directive to the contrary, were to be afforded the same priority as private lenders under non-discriminatory state laws. 440 U.S. at 740, 99 S.Ct. at 1465, 59 L.Ed.2d at 731. Although *Kimbell* involves the priority to be accorded a federal consensual loan where the debtor is solvent, and the case at bar involves the question of the priority to be accorded a federal tax lien in an insolvency, we believe that *Kimbell* provides guidance as to how the federal courts would resolve the case at bar.[7]

In affirming the circuit court, the Court in *Kimbell* noted that the first in time and choateness doctrines were developed to protect federal priority in delinquent tax cases.

7. Since we are construing federal statutes, federal law controls. A state cannot impair the standing of federal liens without the consent of Congress. *United States v. New Britain,* 347 U.S. 81, 84, 74 S.Ct. 367, 369, 98 L.Ed. 520, 525 (1953). *See also Illinois v. Campbell,* 329 U.S. 362, 371, 67 S.Ct. 340, 345, 91 L.Ed. 348 (1946); *Rice Inv. Co. v. United States,* 625 F.2d 565, 573 (5th Cir. 1980). Thus, we construe the statutes in question as we believe the federal courts would construe them.

However, when Congress expanded the number of nonfederal creditors to whom priority was granted by passing the Tax Lien Act of 1966, it was expressing disapproval of "unrestricted federal priority" in tax matters. 440 U.S. at 738, 99 S.Ct. at 1463, 59 L.Ed.2d at 730.[8]

The legislative history of the Tax Lien Act certainly supports this view, as the Senate Finance Committee's Report 1708 indicates:

[I]t is intended that, under the bill, the various types of interests defined in this provision are to have a priority over a nonfiled Federal tax lien if they come within the definitions of these terms [e. g., "purchaser," "judgment lien creditor," etc.] . . . whether or not in all other regards

---

8. The Court also offered the following historical perspective on the use of the "choateness" test:

This Court originally formulated the choate lien test to govern conflicts arising under the federal insolvency statute, Rev.Stat. § 3466, 31 U.S.C. § 191 [31 U.S.C.S. § 191], which awards the United States priority over other creditors in collecting debts from insolvents. In theory, the statute does not defeat liens that are choate at the time of insolvency. But in practice, it has proved difficult for nonfederal lienors to satisfy the strictures of the chaoteness test. See New York v. Maclay, 288 U.S. 290, 53 S.Ct. 323, 77 L.Ed. 754 (1933); United States v. Texas, 314 U.S. 480, 62 S.Ct. 350, 86 L.Ed. 356 (1941); United States v. Waddill, Holland & Flinn, Inc., 353 U.S. 353, 65 S.Ct. 304, 89 L.Ed. 294 (1945); United States v. Gilbert Associates, Inc., 345 U.S. 361, 73 S.Ct. 701, 97 L.Ed. 1071 (1953).

The Court later applied the choateness doctrine outside the insolvency context together with the first in time requirement to give federal tax liens special priority. See United States v. Security Trust & Savings Bank, supra, 340 U.S. at 51, 71 S.Ct. 111, 95 L.Ed. 53. For a discussion of the history of the choate lien test, see Kennedy, The Relative Priority of the Federal Government: The Pernicious Career of the Inchoate and General Lien, 63 Yale L.J. 905 (1954).

440 U.S. at 721, n. 8, 99 S.Ct. at 1454, 59 L.Ed.2d at 719, n. 8. The Court went on to explain that until 1966, § 6323 of the Internal Revenue Code, 26 U.S.C. § 6323 did not specify priority between federal tax liens and nonfederal liens not specifically mentioned in the statute. However, the Federal Tax Lien Act of 1966, 26 U.S.C. § 6323(b), (c), (d), (e) set specific priorities which displaced the doctrines the Court had created to deal with the priority of liens not mentioned in the statute. 440 U.S. at 720, n. 6, 99 S.Ct. at 1454, n. 6, 59 L.Ed.2d at 719, n. 6.

*they are definite and complete at the time notice of the tax lien is filed.*

U.S. Code Congressional and Administrative News, 89th Congress, 2d Sess., v. 3, 1966, 3722, 3724–3725. (Emphasis supplied). In other words, a nonfederal interest such as that of a judgment lien creditor, need not be "choate" in order to prevail, under the Tax Lien Act, over the federal interest.

The Court in *Kimbell* reasoned that if Congress were willing to subordinate federal priority in tax matters, it would be consistent to restrict as well the federal priority which has been extended into non-tax areas by application of the choateness doctrine. Specifically, the Court in *Kimbell* restricted federal priority where the United States had made loans pursuant to social welfare legislation, and the applicable legislation did not specify priority.

Another reason to restrict federal priority in the lending cases is that such restriction is necessary in order to facilitate commercial stability and to avoid the frustration of expectations of superior lien holders:

> The cases under consideration illustrate the substantial new risks that creditors would encounter [if choateness were required]. Neither the financing statement filed by Republic [the bank] nor its security agreement mentioned the SBA. . . . To give the federal lien priority in this situation would undercut the reliability of the notice filing system, which plays a crucial role in commercial dealings. . . . [P]rior creditors such as Kimbell would have no trustworthy means of discovering the undisclosed security interest. Even those creditors aware of a federal agency's lien would have to adjust their lending arrangements to protect against the stringent choateness requirements. In recognition of these burdens, commentators have criticized the doctrine for frustrating private creditors' expectations as well as generating inconsistencies in application. See, e. g., 2 G. Gilmore, Security Interests in Personal Property 1052–1073 (1965); Plumb, Federal Liens and Priorities— Agenda for the Next Decade, 77 Yale L.J. 228 (1967); Kennedy, From Spokane County to Vermont: The Cam-

paign of the Federal Government Against the Inchoate Lien, 50 Iowa L.Rev. 724 (1965); Kennedy, Relative Priority; Comment, The Relative Priority of Small Business Administration Liens: An Unreasonable Extension of Federal Preference?, 64 Mich.L.Rev. 1107 (1966).

Considerable uncertainty would also result from the approach used in the opinions below. Developing priority rules on a case-by-case basis, depending on the types of competing private liens involved, leaves creditors without the definite body of law they require in structuring sound business transactions.

440 U.S. at 739, n.42, 99 S.Ct. at 1464, n.42, 59 L.Ed.2d at 731, n.42.

We believe that these reasons to curb federal priority in lending situations also apply to federal tax liens against insolvent estates. In *Decker's Estate*, a 1946 case involving the assertion of a federal tax lien against an insolvent estate, we noted, as did the United States Supreme Court in *Kimbell*, that the Tax Lien Statute evidenced Congressional disapproval of unrestricted federal priority in tax matters:

> . . . It is urged by appellants that Section 3672 [current § 6323] of the Internal Revenue Code . . . should not be construed as overriding Section 3466 of the Revised Statutes [the Federal Insolvency Statute] but as being limited to solvent debtors whereas Section 3466 relates to insolvent debtors. It is obvious, however, that such a construction of Section 3672 [§ 6323] would be quite unreasonable, since there could be no need or reason for such legislation if intended to provide merely for relative priorities in the distribution of the assets of solvent debtors.

355 Pa. 331, 341, 49 A.2d 714, 719–720 (1946), *cert. den. sub nom. Decker v. Kann*, 331 U.S. 807, 67 S.Ct. 1190, 91 L.Ed. 1828 (1947). Accord, *Meyer Estate*, 159 Pa.Super. 296, 301, 48 A.2d 210, 213 (1946). We remain convinced that it would frustrate the Congressional purpose to defeat in insolvency the very interests that were specifically protected against federal priority in non-insolvency situations. Justice Haynsworth took the same view in a concurring opinion in *H. B. Agsten & Sons, Inc. v. Huntington Trust & Savings Bank* :

It is most unfortunate that the Congress, when considering the Federal Tax Lien Act of 1966, did not focus its attention specifically upon the Insolvency Statute. Had it done so, I am confident the Insolvency Statute would have been repealed or substantially amended, for all of the time, attention and effort expended in drafting, considering and passing the Federal Tax Lien Act of 1966 will be fruitless, except in bankruptcy cases, if the Insolvency Statute is applied to preserve the super-priorities which the Federal Tax Lien Act of 1966 undertook to withdraw from tax claims. The question of priorities is wholly or largely academic, unless the debtor is insolvent, and the clearly stated purpose of the Federal Tax Lien Act of 1966 was to regulate the priority of federal tax claims when competing for payment out of the assets of an insolvent taxpayer with secured claims which would enjoy priority under state law.

388 F.2d 156, 161 (4th Cir. 1967), *cert. den.* 390 U.S. 1025, 88 S.Ct. 1413, 20 L.Ed.2d 282 (1968).

In sum, we would conclude that the provisions of § 6323 of the Internal Revenue Code must be read so as to limit the operation of the Federal Insolvency Statute in tax delinquent cases. We arrive at this conclusion for the following reasons:[9] (1) there is a plain inconsistency between the Tax Lien Act and the Federal Insolvency Statute; (2) the Tax Lien Act evidences a Congressional intent that federal priorities be limited in the tax area; (3) the Supreme Court of the United States has restricted federal priority in federal lending cases for reasons that are also applicable in tax cases (restricting the priority would not endanger the specific objectives of the federal programs and it would have adverse commercial consequences); and (4) to grant absolute

---

**9.** Although we do not offer this as a reason for our opinion, we note with interest that one commentator on Section 3466 Priority, citing six United States Supreme Court cases decided by the middle of the nineteenth century, concluded that "Section 3466 Priority was apparently intended to apply only to unencumbered property of the insolvent debtor." Frank R. Kennedy, "The Relative Priority of the Federal Government: The Pernicious Career of the Inchoate and General Lien," 63 Yale L.J. 905, 907 (No. 7, May 1954).

federal priority would be destructive of commercial stability and would frustrate legitimate commercial expectations.

Although the record in this case does not indicate why the 1971 judgment note here in question was not refinanced under the 1972 mortgage—in which event this case would not have arisen and there would be no question that the bank would have been paid—it is possible that the reason for not refinancing all the debts owing the bank was that interest rates on the refinanced debt would be higher than on the original note. In any event, the bank was, in this case, acting with commercial reasonableness. It had advanced money to Mr. Berretta over many years in commercial loans secured by real property. Surely, this sort of lending arrangement is socially beneficial. If we were to decide in this case the government has priority over the bank, lenders, in order to protect themselves henceforth against a possible insolvency, would be forced to refinance *all* outstanding debts when they refinance a borrower's loans. Since the cost to the borrower could be substantially greater under such a scheme, this sort of refinancing could not be said to stimulate commerce or to be commercially desirable.

## II.

The remaining question, whether the bank's mortgages of March 1, 1961 and April 11, 1972 secured the decedent's judgment note of August 31, 1971, was, in our opinion, correctly decided below. The "dragnet" clause in these mortgages reads as follows:

> This mortgage and accompanying bond are given as additional or collateral security for the payment of any note or notes, writing or writings, contract or contracts, now or hereafter made, endorsed, assigned, delivered or guaranteed by the Mortgage herein,
>
> and now due and to become due and for any note or notes, writing or writings, contract or contracts, given in exchange, substitution, extension or renewal thereof, and now or hereafter purchased, excepted, discounted, ad-

vanced, taken or used by the Mortgagee for the Mortgagor herein.

The defeasance clause in the mortgage provided:

> PROVIDED ALSO, HOWEVER, that if the said Mortgagor, or his Representatives shall without default pay to the said Mortgagee, its Successors or Assigns, the said principal sum, with interest and premiums, or in case of default and of legal process shall before actual sale, pay the same together with commissions and costs aforesaid, then this Mortgage, the estate hereby granted and the said Obligation shall become void.

The record establishes that the 1961 mortgage was refinanced by the 1964 mortgage and fails to establish that there were any outstanding debts owing from decedent to the bank between the 1961 mortgage and the 1964 mortgage. The 1961 mortgage, by the terms of its defeasance clause and in the absence of debts intervening between 1961 and 1964, became "void" when it was paid by subsequent refinancing in 1964.[10] This is so in spite of the fact that the 1961 mortgage was not satisfied. Since the 1961 mortgage was void when it was refinanced by the 1964 mortgage, it could not secure the 1971 note that is at question in this case.

Furthermore, the 1972 mortgage cannot be said to secure the 1971 note because of the plain language in its "dragnet" clause: it provides that the mortgage and bond shall be additional security for "any note or notes ... now or hereafter made...." The 1971 note was neither "now made" nor "hereafter made" at the time of execution of the 1972 mortgage. It was not, then, covered by the terms of the 1972 mortgage.

We would conclude, therefore, that the Tax Lien Act of 1966 modified the operation of the Federal Insolvency Statute by requiring that in an insolvency the federal govern-

---

**10.** Had there been a debt between 1961 and 1964 that was not repaid by the 1964 refinancing, the 1961 mortgage would have remained vital and effective to secure any other debts owing from Berretta to the bank, at least until the debt which arose between 1961 and 1964 was paid in full.

ment's tax claim priority is restricted by the provisions of the Tax Lien Act. Further, we conclude that the August 31, 1971 judgment note was not secured by either the 1961 or the 1972 mortgage.

LARSEN and KAUFFMAN, JJ., join this Opinion in Support of Affirmance.

## OPINION IN SUPPORT OF REVERSAL

ROBERTS, Justice.

In the absence of any clear indication of Congressional intent and in the face of contrary pronouncements from the Supreme Court of the United States, the Opinion in Support of Affirmance has transformed its view of what Congress *should* do into the presumption that Congress has in fact impliedly repealed the Insolvency Statute as to tax liens. I would reverse.

### I.

Thirty-five years ago, in *Meyer Estate*, 159 Pa.Super. 296, 48 A.2d 210 (1946), and *Decker Estate*, 355 Pa. 331, 49 A.2d 714 (1946), cert. denied, *sub nom. Decker v. Kann*, 331 U.S. 807, 67 S.Ct. 1190, 91 L.Ed. 1828 (1947), the Superior Court and this Court each decided that the Federal Insolvency Statute (§ 3466) and the Tax Lien Act (§ 6323) were plainly inconsistent and that Congress must have intended section 6323 to prevail as to tax liens. In the following quarter century it became unmistakably clear that the Supreme Court of the United States held the opposite view.

In *United States v. State of Vermont*, 377 U.S. 351, 357, 84 S.Ct. 1267, 1270–71, 12 L.Ed.2d 370 (1964), the Supreme Court, commenting on the scope of section 3466, stated:

"Section 3466 on its face permits no exception whatever from the statutory command that '[w]henever any person indebted to the United States is insolvent * * * debts due to the United States shall be first satisfied.' The statute applies to all the insolvent's debts to the Government, whether or not arising from taxes, and whether or not secured by a lien."

Earlier, in *United States v. City of New Britain*, 347 U.S. 81, 85, 74 S.Ct. 367, 370, 98 L.Ed. 520 (1954), the Court made this observation:

"When the debtor is insolvent, Congress has expressly given priority to the payment of indebtedness owing the United States, whether secured by liens or otherwise, by § 3466 of the Revised Statutes, 31 U.S.C. (1946 ed.) § 191, 31 U.S.C.A. § 191. In that circumstance, where all the property of the debtor is involved, Congress has protected the federal revenues by imposing an absolute priority (footnote omitted)."

See *United States v. Key*, 397 U.S. 322, 90 S.Ct. 1049, 25 L.Ed.2d 340 (1970); *United States v. Gilbert Associates, Inc.*, 345 U.S. 361, 73 S.Ct. 701, 97 L.Ed. 1071 (1953). *United States v. Security Trust and Savings Bank*, 340 U.S. 47, 71 S.Ct. 111, 95 L.Ed. 53 (1950).

It is obvious that if the Pennsylvania Courts which decided *Meyer Estate*, supra, and *Decker Estate*, supra, in 1946 had had the benefit of these subsequent pronouncements by the United States Supreme Court, they could not have reached the independent and erroneous conclusion that section 3466 was impliedly repealed as to tax liens by section 6323. Nonetheless, the Opinion of Mr. Justice Flaherty continues to rely upon *Meyer Estate* as support for this discredited proposition and suggests that recent court decisions and congressional action have placed the Supreme Court cases which clearly maintain the independent vitality of section 3466 "in a less persuasive perspective" (426 A.2d at 1103 n. 6).

The opinion of Mr. Justice Flaherty focuses on *United States v. Kimbell*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979), as "the most recent expression of the United States Supreme Court on the policy considerations that underlie the question of whether the government, even in the tax area, is to be treated as an ordinary creditor or as a creditor with super-priority." 426 A.2d at 1103. *Kimbell*, however, involved a solvent debtor and the question of the priority to be accorded to a federal consensual loan. Consequently, the

Court examined the policy considerations behind the Federal Tax Lien Act, which indisputably applies to tax liens against all *solvent* debtors, and applied those considerations to an analogous situation, also involving a solvent debtor, to which Congress had not addressed itself.

Nowhere, however, does *Kimbell* state that the Federal Insolvency Statute and section 6323 of the Tax Lien Act are inconsistent. Indeed, *Kimbell* never addresses section 3466. Here, where we are confronted with a claim under section 3466 by the United States against a debtor's estate which is clearly insolvent within the meaning of that section, *Kimbell* is of little if any assistance to the determination of Congressional intent with regard to section 3466. Only by assuming that the Statute and the Act are in fact inconsistent and that Congress intended section 6323 to control, assumptions belied by the language of previous cases and never specifically decided by the Supreme Court, does the opinion of Mr. Justice Flaherty manage to apply *Kimbell*'s reflections on the policy underlying the Tax Lien Act to the Federal Insolvency Statute.

## II.

In *United States v. Emory*, 314 U.S. 423, 433, 62 S.Ct. 317, 322–23, 86 L.Ed. 315 (1941), the Supreme Court of the United States stated: "Only the plainest inconsistency would warrant our finding an implied exception to the operation of so clear a command as that of § 3466." Accord, *United States v. Moore*, 423 U.S. 77, 96 S.Ct. 310, 46 L.Ed.2d 219 (1975). This view was repeated by the Court in 1970, in *United States v. Key*, supra, where the Court also observed that "in approaching a claim of an implied exception to § 3466, we start with the principle . . . that the statute must be given a liberal construction consonant with the public policy underlying it [protection of the public revenues]." 397 U.S. at 324, 90 S.Ct. at 1051. Thus, if the Federal Insolvency Statute and the Tax Lien Act need not be read as inconsistent, then they should not be so interpreted. See Sutherland, Statutory Construction (4th ed.), § 23.09, p. 224.

It is, in fact, entirely possible to read section 3466 and section 6323 as consistent with each other. As the court observed in *H. B. Agsten & Sons, Inc. v. Huntington Trust & Savings Bank*, 388 F.2d 156, 160 (4th Cir. 1967), cert. denied, 390 U.S. 1025, 88 S.Ct. 1413, 20 L.Ed.2d 282 (1968):

"The 1966 Amendment [to the Tax Lien Act] . . . is simply the latest in a series designed to effect precisely limited expansions of the category of secured creditors protected from secret federal tax liens. The insolvency statute at issue here, and the tax lien law are entirely separate entities, no matter how related they may become upon occasion. Covering all debts owing the federal government by an insolvent debtor, the insolvency statute, as has long been established, does not create a lien but simply establishes a priority. *Beaston v. Farmers' Bank of Delaware*, 12 Peters 102, 134, 9 L.Ed. 117 (U.S. 1838) *United States v. Fisher*, 2 Cranch 358, 390, 2 L.Ed. 304 (U.S. 1805). On the other hand, the revenue act, by its terms applies only to tax debts, does create a lien and encompasses all taxpayers regardless of their solvency (footnote omitted)."

See Young, Priority of the Federal Tax Lien, 34 U.Chi.L. Rev. 723, 725 (1967) (§ 3466 and § 6323 raise an "entirely different set of issues"); Kennedy, The Relative Priority of the Federal Government: The Pernicious Career of the Inchoate and General Lien, 63 Yale L.J. 905, 905–907 (1954).

Moreover, section 6323 applies to some insolvencies to which section 3466 is inapplicable. Section 3466 does not apply to all situations in which the debtor is unable to pay his debts as they mature. Rather, it applies only to the limited situations specified in that section; that is, to cases in which "the estate of any deceased debtor . . . is insufficient to pay all the debts due from the deceased" and to

"cases in which a debtor, not having sufficient property to pay all his debts, makes a voluntary assignment thereof, or in which the estate and effects of an absconding, concealed, or absent debtor are attached by process of law, as to cases in which an act of bankruptcy is committed."

This interpretation of the limited number of insolvencies covered by section 3466 has been confirmed by the Supreme Court:

> "Mere inability of the debtor to pay all his debts in ordinary course of business is not insolvency within the meaning of the act, but it must be manifested in one of the modes pointed out in the latter part of the statute which defines or explains the meaning of insolvency referred to in the earlier part. *United States v. State Bank of North Carolina*, 6 Pet. 29, 35 [8 L.Ed. 308]; *United States v. Fisher*, 2 Cranch, 358, 390 [2 L.Ed. 304]; *United States v. Hooe*, 3 Cranch, 73, 90 [2 L.Ed. 370]; *Prince v. Bartlett*, 8 Cranch, 431, 433 [3 L.Ed. 614]; *Conard v. Atlantic Insurance Co.*, 1 Pet. 386, 439 [7 L.Ed. 189]; *Brent v. Bank of Washington*, 10 Pet. 596, 611 [9 L.Ed. 547]; *Field v. United States*, 9 Pet. 182, 201 [9 L.Ed. 94]."

*United States v. Oklahoma*, 261 U.S. 253, 260, 43 S.Ct. 295, 297–98, 67 L.Ed. 638 (1923). Accord, *Bramwell v. United States Fidelity & Guarantee Co.*, 269 U.S. 483, 46 S.Ct. 176, 70 L.Ed. 368 (1926). See also *W. T. Jones & Co. v. Foodco Realty, Inc.*, 318 F.2d 881 (4th Cir. 1963).

This definition of insolvency is hardly all-encompassing. The Uniform Commercial Code, whose provisions as to priority were a motivating force in the 1966 amendment of the Tax Lien Act, see U.S. Code Cong. & Admin. News 1966, p. 3722, provides:

> "A person is 'insolvent' who either has ceased to pay his debts in the ordinary course of business or cannot pay his debts as they become due or is insolvent within the meaning of the federal bankruptcy law."

Uniform Commercial Code § 1–201(23). Under the Bankruptcy Act, 11 U.S.C. § 1(19),

> "a person shall be deemed insolvent within the provisions of this Act whenever the aggregate of his property . . . shall not, at a fair valuation, be sufficient in amount to pay his debts. . . . "

Thus, section 3466 and section 6323 are far from plainly inconsistent. Section 6323 governs priorities in cases where

debtors are solvent and in cases where debtors would be considered insolvent under the provisions of other statutes although they are not insolvent within the meaning of section 3466.

That Congress has chosen to extend the classes protected by section 6323 and to relax the perfection requirements for liens under the section does not, without much more, compel the inference that Congress intended to repeal section 3466 by implication. Section 6323 applies to all solvent debtors and to some types of insolvent debtors, notably those who are unable to pay their debts as they become due. Section 3466, on the other hand, applies only to certain insolvencies, such as the insolvent estates of deceased debtors and the remaining assets of debtors who have absconded. It is certainly reasonable to suppose that Congress might choose to be less "generous" with the government's right of priority in cases where there is little or no likelihood of a second chance for the government to recover its claims.

In sum, since the Superior Court's decision in *Meyer Estate*, supra, the United States Supreme Court has repeatedly recognized the separate existence of section 3466. No opinion of that Court has ever observed otherwise, nor has Congress expressed any intention with regard to the Tax Lien Act that is inconsistent with the broad scope of the Federal Insolvency Statute.

It is manifestly both unwarranted and unwise for this Court to speak for the federal government in an area where both its legislative and judicial branches have chosen to refrain from acting. As the court observed in *H. B. Agsten & Sons v. Huntington Trust & Savings Bank*, supra, "[w]hatever may be the merits of symmetry in these two quite distinct, if cognate, areas the argument seems more properly addressed to Congress than to this Court." 388 F.2d at 160.

The decree of the court of common pleas should be reversed.

O'BRIEN, C. J., and NIX, J., join in this Opinion in Support of Reversal.